Andrew WILLIAMS et al., Plaintiffs,

v.

Marion BARRY, Mayor for the District of Columbia and the District of Columbia, Defendants.

Civ. A. No. 80–1104.

United States District Court, District of Columbia.

May 23, 1980.

---

Florence Wagman Roisman, Ilene J. Jacobs, Washington, D. C., G. Philip Nowak (main counsel), Ronald B. Ravikoff (main counsel), Arnold & Porter, Washington, D. C., for plaintiffs.

Leonard Bren, Asst. Corp. Counsel, Washington, D. C., for defendants.

### MEMORANDUM AND ORDER

FLANNERY, District Judge.

This case poses a narrow but difficult issue: whether the District of Columbia government must afford procedural protections before cutting off funds to support shelters for homeless males.

In February, 1978, the District of Columbia government announced that it would open Blair School as an emergency housing center for homeless men. The program was expanded in December 1978 with the opening of Pierce School. Publication of notice in the D.C. Register preceded the opening of both the Blair and Pierce shelters. These facilities each house an average of 115 men each night.

The District of Columbia also executed a contract with the Gospel Mission. The city pays the mission eight dollars per night for their services. Approximately 60 men sleep at the mission each night.

The services provided at the Blair and Pierce Schools and the Gospel Mission encompass the most basic necessities of life: a free shower, meal, and a place to sleep.

On February 14, 1979, the Mayor publicly announced his Policy on Homelessness. Mayor's Press Conference Statement on Homelessness, February 14, 1979. The Mayor's Press Statement noted that "shelter is a basic human right." The policy statement, released on the same date, artic-

ulated that "anyone who requests, or, is in apparent need of, shelter is entitled to it." Also on February 14, Mayor Barry established a Commission on Homelessness. The Commission was created to assist the effectuation of his stated policy. On March 9, 1979, the Mayor's Office and the Commission on Homeless Persons reached a formal agreement regarding the operation of some of the shelters. The agreement called for the Department of Human Resources to manage these facilities.

In late April, 1980 some of the homeless persons learned that Mayor Barry planned to cut off funding, thereby forcing the closure of the homes, effective May 5. The plaintiffs maintain that the Mayor plans to close the Pierce School, to end the city's contract with the Gospel Mission, and to allow a private charitable organization to take over the Blair School. The Blair facility would then charge a fee for each homeless person who wishes to take advantage of its basic necessities.

Judge Harold Greene granted a temporary restraining order on Sunday, May 4. This court extended the TRO on May 8, and heard oral argument on the plaintiffs' motion for a preliminary injunction on May 21.

Preliminarily enjoining the District from closing these facilities is appropriate if the plaintiffs can demonstrate: 1) irreparable injury; 2) a favorable balance of the equities; 3) public interest; and 4) likelihood of success on the merits. *Virginia Petroleum Jobbers Association v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958).

The D.C. Circuit recently clarified the weight accorded these factors in *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977). The court explicated that when the first three factors are compelling, the likelihood of success need not constitute a mathematical probability:

> [A] court, when confronted with a case in which the other three factors strongly favor interim relief may exercise its discretion to grant a stay if the movant has made a substantial case on the merits. The court is not required to find that

ultimate success by the movant is a mathematical probability, and indeed, as in this case, may grant a stay even though its own approach may be contrary to movant's view of the merits. The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other factors.

In the instant case the level of irreparable injury, the balance of equities, and the public policy strongly favor injunctive relief. The plaintiffs have also demonstrated a likelihood as to success on the merits. The court will therefore grant a preliminary injunction pending a full briefing and hearing on the merits.

## I. *IRREPARABLE INJURY*

It is difficult to imagine a situation involving more egregious irreparable injury. The shelters provide indigents with housing, food, and sanitation. Their discontinuance would deprive the plaintiffs of these life support services. Without the shelters, these people will revert to alleys, heating grates, and garbage bins. Accordingly, a cut off of funding will irreparably deny the indigents these human necessities.

It is clear that a large number of homeless men will irreparably lose these basic necessities if funding is terminated. The Director of the Gospel Mission states that his facility averages 32 vacant beds per night. Declaration of Reverend Lincoln Brooks, Jr., ¶ 9. The Pierce School alone, on a typical night, serves 115 men. Facilities are simply unavailable to shoulder the increased burden should the District close its shelters for homeless men.

Moreover, the District plan to charge a nominal fee at the Blair School would preclude additional persons from receiving shelter and food. The Mayor's Advisory Commission on the Homeless reported that 46% of the men staying at the city shelters receive no income at all. Affidavits submitted by the plaintiffs confirm this. *See, e. g.*, Bright declaration at ¶ 6. ("I could not stay at Blair if I had to pay."); Williams declaration at ¶ 9 ("I don't have any income."); Brinkley declaration (same).

## II. BALANCE OF THE EQUITIES

The harm to the defendant in granting injunctive relief, while not de minimus, is outweighed by the deprivation to the plaintiffs. It is estimated that the total cost to the city for providing services at the three locations is $20,000 per week. It is common knowledge that the District faces a budget crisis. But the savings accrued from closing these facilities would be minimal.

The record reveals that many of the indigents, if forced to leave the shelters, would resettle at D.C. General Hospital, St. Elizabeth's, and the D.C. jail. It is more costly to maintain persons at these facilities than at the shelters. Hence, it is questionable whether closing the shelters would benefit the D.C. budget deficit.

But even assuming the District could save $20,000 per week, injunctive relief need cost the District no more than $100,000. The only issue before this court is whether procedural protections must first be enacted before the District may discontinue funds supporting the shelters. The District could elect, during the pendency of an injunction, to publish notice and hold a hearing. This could be accomplished, if performed expeditiously, in five weeks. Should the Mayor still favor closing the shelters—after the plaintiffs participated in the decisionmaking process—then funding may properly be discontinued.

The court recognizes that $100,000 is not an insignificant amount of money. But the court finds that the issue of homeless persons is so sensitive, the needs of these people are so great, and their potential deprivation so basic, that the harm to the defendants is greatly outweighed by the injury to the plaintiffs.

## III. PUBLIC INTEREST

The public interest would be served by keeping the shelters open. Public safety alone dictates this conclusion. The record reveals that many of these people are emotionally unstable. James S. Byrne, a member of the D.C. Commission on Homelessness, notes that "to a great extent the problem of homelessness was caused by a lack of support services for those persons released from St. Elizabeth's Hospital." Declaration of James S. Byrne, ¶ 5.

Some of the homeless persons may resort to crime to satisfy their food, drink, and shelter needs. Grover declaration. Others will simply wander the streets at night. Still others will wind up in jail.[1] The public would be better served by having homeless persons housed at night rather than flushing these people onto the city streets and forcing them to find shelter and food that is beyond their means to obtain.

## IV. LIKELIHOOD OF SUCCESS ON THE MERITS

### A. Background

■ The merits issue before this court is an extremely narrow one. No one questions that the District of Columbia may cut off these funds. Whatever the humanitarian or emotional considerations, the government assumes no obligation to house and feed indigent people. The relevant question is whether the D.C. government can discontinue the funds without first affording notice and hearing. The court therefore addresses whether the plaintiffs will likely succeed in demonstrating that the D.C. government must employ procedural safeguards before terminating support for homeless person shelters.

■ The Fifth Amendment of the United States Constitution states that "No person shall . . . be deprived of life, liberty, or property, without due process of law." The Supreme Court originally employed this phrase to apply procedural protections when the government attempted to deprive a citizen of his personal or real property.

Deprivations of government supported goods and services were not afforded procedural protections until relatively recent

---

1. An attorney who represents indigent defendants noted that many of these people each week are sent to the shelters for homeless men. Declaration of Donald J. Schultz. Closing the shelters will force these men to await trial in jail.

times. This concept was embedded in the rights-privilege distinction. A right conferred by common law or constitutional origins deserved procedural protection; however, a government supported benefit constituted a privilege that could be withdrawn by the government at its whim.

During the 1970's the Court abandoned the rights-privilege distinction. It expanded the scope of procedural due process to include certain government benefits. Hence, state and city officials cannot discontinue welfare payments without a pre-termination notice and hearing. *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). A post-termination hearing must be afforded for the discontinuance of social security disability benefits. *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Public education may not be suspended without a notice and pre-suspension hearing. *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). A hearing must be provided before suspending a driver's license. *Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971). And discontinuance of public employment, under certain circumstances, necessitates hearing and notice. *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

These decisions recognize that certain government benefits constitute property interests. But the mere receipt of a government benefit categorized as a property interest is not enough to require the attachment of procedural protection. The benefit must, in the specific circumstances conferred, constitute an entitlement. It is necessary that the state fostered an expectation rather than a mere hope or desire.

Hence, for procedural protections to apply to the cut off of a government supported benefit, the court must find: 1) the government benefit, generically speaking, qualifies as a property interest; and 2) the property interest, under the specific circumstances conferred, constitutes an entitlement rather than a hope or desire.

### B. *Property Interest*

The Supreme Court has recognized a property interest in welfare, *Goldberg, supra*, social security, *Eldridge, supra*, employment, *Sindermann, supra*, drivers' licenses, *Bell, supra*, and public education, *Goss, supra*.

Courts have also found little difficulty in recognizing a property interest in housing. This is looked upon as a continuing interest in occupancy. For example, in *Caramico v. HUD*, 509 F.2d 694 (2d Cir. 1974), nonowner occupants of FHA insured mortgage dwellings sought to enjoin their eviction. The Second Circuit held that the government must first afford some form of notice and hearing. It expressly recognized "a protected interest in continued occupancy." *Id.* at 701.

In *Joy v. Daniels*, 479 F.2d 1236, 1240 (4th Cir. 1973), the Fourth Circuit found that a quasi-public housing tenant enjoyed an interest stemming from "a property right or entitlement to continue occupancy until there exists a cause to evict other than the mere expiration of the lease." *Id.* at 1241. The same issue emerged in *Lopez v. Henry Phipps Plaza South, Inc.*, 498 F.2d 937, 943 (2d Cir. 1974). The court noted that government subsidization of housing, coupled with a "custom of renewal thereunder," gives rise to a protected property interest akin to a "mutually explicit understanding." *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570.

These cases, finding a property interest in continued occupancy, are in keeping with the Supreme Court's teachings in *Goldberg v. Kelly, supra*. The Court in *Kelly* explicated that when termination of a government benefit "may deprive an *eligible* recipient of the very means by which to live," the government benefit constitutes a property interest. 397 U.S. at 264, 90 S.Ct. at 1018.

The property interest herein is more severe than that recognized in *Goldberg*. While in *Goldberg* "welfare provides the means to obtain essential food, clothing, housing, and medical care," *id.*, the elimination of the homeless person shelters would

deprive the recipients of their homes, food and sanitation facilities. Instead of eliminating the means for obtaining the basic necessities of life, the District of Columbia would eliminate those very end product life support functions. Accordingly, like the residents in *Caramico, Joy,* and *Lopez,* the homeless persons possess a property interest in continued occupancy and use of their shelter.

### C. *Entitlement*

The ability to find a property interest in government supported housing is clear; whether the D.C. homeless person shelters rise to the level of a statutory entitlement is a more difficult question.

■ The term statutory entitlement emerged when the Supreme Court expanded those interests protected by procedural due process to include government benefits conferred upon citizens by the states. But the term is misleading; an entitlement may exist without a statute.

The Supreme Court clearly articulated the necessity of an entitlement in *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972):

> Certain attributes of 'property' interests protected by procedural due process emerge from these decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must, instead, have a legitimate claim of entitlement to it.

The Court further defined the entitlement requirement in a companion case to *Roth, Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972):

> [P]roperty denotes a broad range of interests that are secured by 'existing rules or understandings.' A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing.

*Roth* and *Sindermann* make clear that an entitlement may exist without statute. In that situation, there must be a mutually explicit understanding by both parties concerning the receipt of the benefit.

This Circuit Court of Appeals has accepted the notion of entitlement without statute. *Sherrill v. Knight,* 569 F.2d 124 (D.C. Cir. 1977). In *Sherrill,* the D.C. Circuit ruled that procedural due process applies to the issuance of a press pass for the White House. The ruling relied upon a liberty—not a property—interest. But the court also noted, in a footnote, that the press pass might just as well constitute an interest in property. The court stated:

> A related and perhaps equally compelling *property* interest may also be said to require the procedural protections of the fifth amendment. . . . While appellee's entitlement is not created expressly by the Constitution or by positive federal law, it is created by the consistent, positive action of federal officials.

*Id.* at 131 n. 22.

■ The Corporation Counsel maintains that the funding for homeless person shelters amounted to an informal action. Any continued funding thereby constitutes only a unilateral expectation on behalf of the homeless persons. Absent a mutually explicit understanding, *Perry, supra,* procedural protections fail to apply.

The City's funding of the shelter homes constitutes more than executive fiat. The City of Washington established a 2½ year policy of shelter for homeless people; this policy spanned two mayoral administrations; the policy on homelessness was articulated publicly by Mayor Barry and officially recorded in the Mayor's Policy Statement on Homelessness; a Commission on Homelessness was established by the Mayor, an agreement was reached between the Mayor and the Commission; and notices of the opening of the shelters were published in the D.C. Register.

The totality of the circumstances demonstrate that, rather than engaging in administrative fiat, the District of Columbia charted a course of deliberate, consistent

action that solidified and expanded the homeless person program. These actions constitute the "consistent, positive action" of City officials, *Sherrill, supra,* 569 F.2d at 131 n. 22, necessary to find an entitlement in the absence of a statute. The City created a state fostered expectation of continued shelter services. This expectation, created by the City, rose above the level of a mere hope or desire. The continued funding of the shelters therefore may also amount to a "mutually explicit understanding." *Perry, supra,* 408 U.S. at 601, 92 S.Ct. at 2699. Accordingly, it is incumbent upon the City to apply procedural safeguards [2] before cutting off the funds that support these facilities.

## V. CONCLUSION

■ The issue of aid to homeless persons raises strong emotional concerns. The City of Washington nonetheless enjoys an unquestioned right to cut off these funds. If Mayor Barry, given budget difficulties, elects to discontinue funding for homeless persons, he possesses the power to do so. But the plaintiffs have made a sufficient showing to enjoin the cutoff of funds absent the prior employment of procedural due process protections.

Accordingly, the court herein only holds that the plaintiffs have raised a likelihood that continued receipt of shelter services from the city constitutes an entitlement to a property interest. Since the plaintiffs have convincingly established irreparable injury, public policy, and balance of the equities, the grant of a preliminary injunction is warranted. *Holiday Tours, supra,* 559 F.2d at 843.

An appropriate Order accompanies this Memorandum.

### ORDER

This matter comes before the court on the plaintiffs' motion for a preliminary injunction. Upon consideration of the memoranda submitted by the parties, the record herein, the applicable law, and the arguments presented at the hearing on May 21, 1980, the court finds that:

1. The plaintiffs will suffer immediate and irreparable injury if the District of Columbia discontinues funding for the Blair and Pierce shelters for homeless men and the Gospel Mission;

2. The public interest requires that defendants continue to make free shelter and related services available to destitute, homeless men;

3. The injury incurred by the defendants is greatly outweighed by the harm to the plaintiffs; and

4. There is a likelihood that plaintiffs will prevail on the merits of their procedural due process claim.

Therefore, in accordance with the foregoing, it is, by the court, this 23rd day of May, 1980,

ORDERED that defendants, their agents, officers, servants, employees, and attorneys, and any persons in active concert or participation with them, be, and they are hereby restrained until the determination of plaintiffs' application for a permanent injunction and other relief, from directly or indirectly terminating, reducing, imposing a charge for, or otherwise derogating the free shower, food services, and shelter now provided at Pierce and Blair Schools and, by contract, at the Gospel Mission; and it is further

ORDERED that the defendants shall prominently post copies of this Order at the Blair and Pierce Schools and at the Gospel Mission; and it is further

ORDERED that counsel for the parties appear before this court at 10:00 a. m. on June 5, 1980 for a status hearing.

---

2. The procedural protections applied to a specific deprivation depend upon balancing the interests at stake along with the risk of erroneous deprivation. *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The necessary procedures in the instant case need be decided, if necessary, after a full briefing and hearing on the merits. It is nonetheless clear that some form of pre-termination notice and hearing should be provided. *Goldberg v. Kelly,* 397 U.S. 254, 267–70, 90 S.Ct. 1011, 1020–21, 25 L.Ed.2d 287 (1970).