Marion BARRY, Jr., et al.,
Appellants/Cross–
Appellees,

v.

Bivens LITTLE, et al., Appellees/Cross–
Appellants.

Nos. 92–CV–1157, 92–CV–1448.

District of Columbia Court of Appeals.

Argued Dec. 8, 1994.
Decided Dec. 18, 1995.

Karen L. McDonald, Assistant Corporation Counsel with whom Vanessa Ruiz, Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellants/cross-appellees.

John G. Roberts, Jr., with whom Walter A. Smith, Jr., John C. Keeney, Jr., L. Anthony Sutin, Adam H. Charnes, Lynn E. Cunningham, Robert Berlow, Patricia Mullahy Fugere, Frank R. Trinity, Joan D. Christopher, Faith Mullen and Arthur B. Spitzer, were on the brief, for appellees/cross-appellants.

Before WAGNER, Chief Judge, and STEADMAN, Associate Judge and BOWERS,* Associate Judge of the Superior Court of the District of Columbia.

BOWERS, Associate Judge:

Plaintiffs,[1] a class of District of Columbia residents receiving General Public Assistance (GPA) benefits on June 30, 1991 under the Public Assistance Act of 1982, D.C.Code §§ 3–201.1 to 3–221.1 (1988 Repl.),[2] suffered the termination of those benefits when they were later found not to be "disabled" under D.C.Law 9–27,[3] originally enacted as emer-

---

* Sitting by designation pursuant to D.C.Code § 11–707(a) (1995).

1. This case is before the Court on cross appeals. Defendants below are appellants/cross-appellees; plaintiffs below are appellees/cross-appellants. For ease of reference, the trial court designations will be used in this opinion.

2. The trial court's order of January 29, 1992 certified the class as "all persons residing in the District of Columbia whose general public assistance benefits were terminated on or after July 1, 1991 on the ground that such persons were found by the Department of Human Services not to be 'disabled' and whose benefits were terminated without a hearing and without a specific notice as to the actual basis for the administrative finding."

3. Omnibus Budget Support Emergency Act of 1991, D.C. Act 9–37 (emergency legislation) and Public Assistance Act of 1982 Budget Conformity Amendment Act of 1991, D.C. Law 9–27 (permanent legislation). In passing the permanent legislation, the D.C. Council simply adopted the language contained in the emergency legislation. D.C. Law 9–27 is now codified at D.C.Code §§ 3–

gency legislation, effective July 1, 1991, amending the 1982 statute. These terminations were to become effective at the end of the recipients' current "certification period."[4] The non-disability findings were made without any pre-termination hearings and were followed by termination notices from the Department of Human Services (hereinafter, "DHS") which failed to disclose the basis of such findings. After first seeking administrative "fair hearings," the aggrieved recipients thereafter filed in Superior Court this class action lawsuit, claiming that the notices were violative of D.C.Code § 3–205.55 (1994 Supp.), and that the notices, as well as the final sentence of D.C.Code § 3–205.53(c) (1994 Supp.), precluding the payment of benefits pending appeals from non-disability findings, were violative of the Due Process Clause of the Fifth Amendment. The Superior Court agreed with these contentions, declared D.C.Code § 3–205.53(c) (1994 Supp.) unconstitutional on its face, granted plaintiffs' motion for partial summary judgment[5] and issued a permanent injunction[6] (a) enjoining the District of Columbia[7] from terminating GPA benefits of any class member without providing such person with adequate notice and the opportunity for a pre-termination hearing and (b) ordering rein-

statement of benefits and retroactive payments from date of termination to date of reinstatement. The District appeals from these rulings. The lower court, however, refused to reinstate the benefits of a subgroup of plaintiff class who re-applied for benefits but failed to appeal the denials of their re-applications. Their appeal of that refusal constitutes the cross-appeal.

Because we conclude that plaintiffs possessed no "property interest" in the continued receipt of GPA benefits extending beyond the expiration of their current certification period following enactment of D.C.Law 9–27, we reverse the trial court's judgment declaring unconstitutional D.C.Code § 3–205.53(c) (1994 Supp.). For the same reason, we find no *constitutional* deficiency in the termination notices. The District concedes, however, that said notices were violative of D.C.Code § 3–205.55 (1994 Supp.) and hence, for that reason, does not challenge the order of the trial court requiring reinstatement of benefits. The order awarding a lump-sum retroactive payment, however, is challenged on appeal as an unwarranted exercise of the trial court's equitable powers in fashioning

201.1 to 3–221.1 (1994 Supp.). In this opinion, citations to the pre-amendment statute are provided without a date. Citations to the codification of D.C. Law 9–27 are followed by (1994 Supp.).

4. Prior to the 1991 amendment to the Public Assistance Act of 1982, a needy adult resident of the District of Columbia could qualify for GPA benefits if he were either incapacitated or disabled. A person was deemed "incapacitated" if he or she had a physical or mental impairment of such a debilitating nature as to reduce substantially or eliminate that person's ability to support himself or herself, and which was expected to last for a period of at least 30 days. A person was deemed "disabled" however, only if the impairment precluding engagement in gainful activity was expected to result in death or last for a period of not less than 12 months. D.C.Code § 3–205.42. In the absence of a reapplication and new determination of eligibility, payments based on incapacity were limited to a certification period of six months and those based on disability were limited to a certification period of twelve months. D.C.Code § 3–205.53.

5. One issue, not germane hereto, remains for trial. An order granting partial summary judg-

ment is usually considered a non-appealable interlocutory order in the absence of a certification under Super.Ct.Civ.R. 54(b). *Cohen v. Owens & Co.,* 464 A.2d 904 (D.C.1983). However, because injunctive relief was granted pursuant to said judgment, this appeal is properly before us pursuant to D.C.Code § 11–721(a)(2)(A) (1995 Repl.). *See Gomez v. Turner,* 217 U.S.App.D.C. 281, 285, n. 5, 672 F.2d 134, 138, n. 5 (1982); *Roth v. Board of Regents,* 446 F.2d 806, 807 (7th Cir.1971) (rev'd on other grounds, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)); *Ortiz v. Eichler,* 794 F.2d 889, 891 (3rd Cir.1986).

6. A preliminary injunction awarding similar relief to plaintiff class had earlier been issued.

7. In addition to the District, the remaining named defendants at the time the complaint herein was filed were Sharon Pratt Kelly, Mayor; Vincent Gray, Director, Department of Human Services and James Butts, Administrator, Income Maintenance Administration, Department of Human Services. Their successors in office have now been substituted in their stead, pursuant to D.C.App.Rule 43(c). The defendants shall all hereinafter be referred to collectively as "the District."

a remedy. We agree and reverse that order.

Because we find no abuse of discretion in the trial court's decision not to grant any relief to those members of plaintiff class who failed to appeal the denials of their reapplications for GPA benefits, we affirm its ruling challenged on cross-appeal.

## I.

### D.C.Law 9–27 and its Legislative History

In the spring of 1991, at the urging of the Mayor due to severe budgetary constraints, the D.C. Council passed emergency legislation (made permanent by D.C.Law 9–27), effective July 1, 1991, which substantially altered the GPA program in several respects. First, it eliminated "incapacity" as a ground for the receipt of GPA benefits. Second, it changed the substantive definition of "disability." Under the new standard, an individual "shall be deemed to be disabled if the individual is determined by the Mayor to be disabled based upon the criteria for the supplemental security income program established pursuant to the Social Security Amendments Act of 1972 (42 U.S.C. § 1381 *et. seq.*)." D.C.Code § 3–205.42 (1994 Supp.).[8] Third, unlike the welfare legislation in effect prior to July 1, 1991, it provided that GPA benefits would not be continued during the appeal of a termination of benefits based on a finding that the recipient is not disabled. Lastly, of pivotal significance to the outcome of the instant appeal, it added to the pre-existing statute an entirely new section, now codified at D.C.Code § 3–205.42a (1994 Supp.), captioned "Eligibility for General Public Assistance." This new section reads as follows:

(a) Except as provided in subsection (b) of this section, beginning July 1, 1991, an individual shall be eligible for GPA benefits only if the individual has a disability as defined in Sec. 3–205.42(2).

(b) An individual who is receiving GPA benefits on June 30, 1991, may continue to receive GPA benefits until the expiration of the individual's certification period. Benefits beyond the expiration of the certification period shall not be paid to an individual unless the GPA recipient reapplies for benefits and is determined to have a disability as defined in Sec. 3–205.42(2) ...[9]

On March 18, 1991, Bill 9–159, the Public Assistance Act of 1982 Budget Conformity Amendment Act of 1991 (which ultimately was enacted as D.C.Law 9–27) was introduced in the District of Columbia Council at the request of the Mayor and referred to the Committee on Human Services. On April 25, 1991 this Committee issued a Report, signed by its Chairman, H.R. Crawford (hereinafter, The "Crawford Committee Report"), recommending the Bill's approval by the full Council. In the section of the Report captioned "Background and Need," the Report refers to the Mayor's revised Fiscal Year 1991 and Fiscal Year 1992 budget proposals submitted to the Council to deal with severe budget and financial constraints facing the city brought on by the then-current economic recession. One of the proposals called for "a reduction in spending in various District-funded programs, including a reduction in the General Public Assistance Program (GPA)...." Crawford Committee Report at 2. This reduction in GPA spending was needed to offset increased spending re-

---

8. Under the federal Supplemental Security Income (SSI) program, an individual is considered disabled only if his physical or mental impairment is of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B). Under implementing regulations, a five-step sequential evaluation process is utilized for determining whether a claimant is disabled. *20 C.F.R.* § 416.920 (1995). This process is fully explained in *Pagan v. Bowen,* 274 U.S.App.D.C. 113, 862 F.2d 340 (1988).

9. Interestingly, in the "Section by Section Analysis" segment of the Crawford Committee Report, discussed *infra,* it is stated that "[t]his provision permits individuals currently receiving GPA *under the incapacity provision* to continue to receive those benefits until their recertification period arrives. At that time, the individual must then meet the new criteria to be eligible." (Emphasis added.) Actually, however, in the 1991 Act this temporal limitation literally applies to *all* persons receiving GPA benefits on June 30, 1991, whether on the basis of incapacity or on the basis of the then-definition of disability.

quired to adequately fund a growing Aid to Families with Dependent Children (AFDC) caseload. *Id.* at 3. Bill 9–159 sought to accomplish this reduction in GPA spending primarily by repeal of the "incapacity" eligibility criteria. In this same "Background and Need" Section, the Crawford Committee Report made the following observation:

> An individual on GPA receives a payment of $270 per month. During the first 6 months of FY 1991, an average of 4685 persons per month received GPA. Of that number approximately 3,200 had an incapacity (and) 881 were permanently disabled and were applying for SSI.... Current estimates are that about 1,500 persons would lose GPA eligibility with the repeal of the incapacity eligibility criteria.

*Id.* at 5.

Finally, at a Committee meeting held on April 25, 1991 to consider and mark up Bill 9–159, Council Chairman John Wilson, clearly recognizing the detrimental impact that passage of the Bill would have upon many GPA recipients, stated that:

> the present financial situation calls for some hard, unpopular decisions, and ... this one (the vote on Bill 9–159) is one of the first that the City Council will have to make.

Crawford Committee Report at 19.

## II.

### Trial Court Statement of Issues and Findings

In a Memorandum Opinion dated September 8, 1992 and issued contemporaneous with the issuance of a Permanent Injunction in favor of plaintiffs, the trial court described the issues before it in these words:

> Lest there be any doubt, this case does not involve a challenge to the legislature's right and power to make changes in eligibility criteria. Rather, the real issue in this case is the lack of a pretermination hearing (denied by statute) and adequate notice of termination to the affected recipients.
>
> The focus of the case is the asserted constitutional deficiency of the manner in which the District of Columbia has implemented 1991 legislation that changes the criteria for these [GPA] benefits. The term "implemented" refers to executive branch action as well as a specific statutory mandate.

Memorandum Opinion at 2.

The statutory mandate referred to above, which the trial court declared unconstitutional on its face, is the final sentence of D.C.Code § 3–205.53(c) (1994 Supp.), which states that "[b]enefits shall not be continued beyond the effective date of termination if the sole basis for the individual's appeal of the termination is the failure to meet the disability standard defined in Sec. 3–205.42."

Among the trial court's Findings of Fact[10] were the following relating to implementation of the 1991 legislation by the Department of Human Services:

> 1. The same recertification forms (one to be executed by the recipient and one by his or her physician) were used as had been used under the pre–1991 legislation.
>
> 2. At no time prior to or during the recertification process did GPA recipients or their doctors receive a notice from DHS warning that the person was to be evaluated under the new medical eligibility standard.
>
> 3. The termination notices merely stated that the GPA recipient was found not to be disabled, without specifying the underlying basis therefor.

## III.

### Due Process Analysis

A. *Property Interest, if Any, Derived from Provisions of D.C.Law 9–27*

We begin by taking note of what this case does *not* involve. In its Memorandum Opinion dated March 9, 1992, accompanying the

---

10. These Findings of Fact, made by the trial court in its Memorandum Opinion of March 9, 1992, accompanying the issuance of a Preliminary Injunction, were later incorporated by reference into its Opinion of September 8, 1992, accompanying the issuance of a Permanent Injunction.

Preliminary Injunction, the trial judge observed that

> [b]ecause of the nature of the allegations and the status of the plaintiffs as current recipients, this litigation does not concern those persons who were brand new applicants for benefits in the post-July 1, 1991 era.

Further, at oral argument in this court, plaintiffs' counsel stated that the class he represents "does not include people who first became eligible under the new law." When answering an inquiry concerning new applicants under the 1991 legislation, he responded, "I don't represent those persons." Hence, the narrow issue before this Court may be stated thusly: whether those persons receiving GPA benefits on June 30, 1991 who, upon expiration of their current certification periods, were found not "disabled" under D.C.Law 9–27, had a property interest in, and a constitutional right to, the continuation of such benefits pending an administrative "fair hearing." The trial court ruled that they did. We disagree and reverse.

■ Plaintiffs' counsel, at oral argument, candidly acknowledged that the Council *could* have limited a recipient's entitlement to GPA benefits to a concrete, finite span of time, such as a year or a "certification period." There can be no doubt that the legislature has the power to define and limit the scope and duration of any entitlement program it creates. *Atkins v. Parker*, 472 U.S. 115, 129, 105 S.Ct. 2520, 2529, 86 L.Ed.2d 81 (1985). However, plaintiffs assert that the 1991 legislation, under which they contend their property interest is derived, contained no such limitation.[11] Their argument in support of this proposition is set forth in their Brief as follows, at 14:

> Before the termination, plaintiffs were receiving benefits under statutory standards defining eligibility for those benefits.... Entitlement to GPA benefits is determined by satisfying the substantive eligibility criteria specified by District law ... namely,

being over the age of 18, being financially needy, satisfying the residency requirement and *meeting the medical eligibility standard.* A person who satisfied each of these criteria remains under District law, eligible for GPA benefits for an indefinite period, and a recipient who is improperly terminated is entitled to full retroactive benefits.

(Emphasis added.)

■ What this argument overlooks is that, after June 30, 1991, the members of plaintiff class did *not* meet the medical eligibility standard. It had been changed by D.C.Code § 3–205.42(2) (1994 Supp.), effective July 1, 1991. Because of the city's fiscal crisis, the "incapacity" criteria had been repealed and the "disability" criteria re-defined. Moreover, the Council did not leave to conjecture the issue of the duration of benefit entitlement for these pre-July 1, 1991 GPA recipients. By the express language of D.C.Code § 3–205.42a(b) (1994 Supp.), the "grandfather clause" under which these plaintiffs continued to receive payments, their benefits would continue only "until the expiration of the individual's certification period" unless the individual "reapplied" and was found to fall within the new definition of disability.[12] Further, D.C.Code § 3–205.53(c) (1994 Supp.) eliminated the right to continuation of benefits pending administrative appeal of a non-disability determination. Read together, particularly in light of the city's fiscal woes, it is readily apparent that these two statutory provisions were intended by the Council to serve as a substantive temporal limitation upon the GPA entitlement for those persons receiving benefits at the time of enactment of D.C.Law 9–27. Thus, unlike *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), this case does not involve an ongoing statutory entitlement of indefinite duration cut short by administrative action. Rather, it involves a transitional statutory

---

11. At least twice during oral argument, counsel for plaintiff class asserted that their claimed property interest arose under the 1991 legislation (coupled, to be sure, with their status as recipients of benefits under the 1982 Act).

12. *See DeLao v. Califano*, 560 F.2d 1384 (9th Cir.1977) (property interest of "grandfathered" disability recipients is limited to the period of time specified in grandfather clause).

entitlement granted to a limited class of persons for a limited period of time.[13]

Because D.C.Law 9–27 expressly limited plaintiffs' entitlement to benefits to a specific time period, namely, their current "certification period," plaintiffs had no property interest extending beyond that period of time. This certification period, therefore, was not a "procedural" mechanism for the enforcement of a right provided for under state law, but a substantive limitation upon that right. *See Atkins, supra,* 472 U.S. at 129, 105 S.Ct. at 2529. Hence, plaintiffs' reliance upon *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) is misplaced. While that case makes plain that where a property interest exists under state statute, the procedures to be followed in terminating that interest must comply with federal constitutional law, it sheds no light upon the issue presented herein; namely, whether, at the time their GPA benefits were terminated, these plaintiffs did in fact possess any property interest in such benefits. *Loudermill,* 470 U.S. at 544, 105 S.Ct. at 1494.

A case which does bear directly upon the issue, however, is *Banks v. Block,* 700 F.2d 292 (6th Cir.), *cert. denied,* 464 U.S. 934, 104 S.Ct. 341, 78 L.Ed.2d 309 (1983). There, the Sixth Circuit, after a review of the statute, legislative history and regulations governing the federal Food Stamp Program, as amended by Congress in 1977, concluded that "a household has no protected property interest in the continuous entitlement to food stamps beyond the expiration of its certification period." *Id.* at 297. Any anticipated receipt of food stamps beyond the certification period was deemed to be "an unprotected unilateral expectation" insufficient, under the holding of the Supreme Court in *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), to create a constitutionally protected property interest. As did the Fourth Circuit in *Holman v. Block,* 823 F.2d 56 (4th Cir.1987) and *Jackson v. Jackson,* 857 F.2d 951 (4th Cir.1988), we, too, find the analysis of the Sixth Circuit in *Banks* persuasive. While there are differences between the District's GPA program and the federal food stamp program, there are some basic similarities, the most fundamental of which is that each provides benefits for a time-limited period (the certification period) and requires that recipients reapply if they wish to continue receiving the benefits. 7 U.S.C. § 2020(e)(4); D.C.Code §§ 3–205.42a(b) and 3–205.53(b) (1994 Supp.). Under both programs, the administrative agency implementing its requirements must issue timely notices to the recipients advising them of the coming expiration of their certification periods and informing them of the forms required to be submitted with, and the time limitations upon, any request for continuation of assistance. 7 U.S.C. § 2020(e)(4); D.C.Code § 3–205.53(c) (1994 Supp.). Finally, in the federal food-stamp program, benefits beyond expiration of the certification period are precluded pending administrative appeals. 7 U.S.C. 2020(e)(10). In the District's GPA program, such benefits likewise are precluded where, as here, the appeal is based solely upon a finding of non-disabili-

---

**13.** Although the subject of considerable dialogue at oral argument, this case also does *not* involve D.C.Code § 3–205.53(b) (1994 Supp.), which establishes a new 12–month certification period for all GPA recipients and specifies that no further payments be made for the same disability unless the grant is reviewed as a result of a reapplication by the applicant or recipient. This is so because the "disability" referred to therein is the one newly-defined in the 1991 legislation (Sec. 3–205.53(b) of the predecessor statute deals with "incapacity"), under which these plaintiffs have never qualified. Thus, their property interest, if any, flows not from their once having been found disabled and now seeking recertification under Sec. 3–205.53(b) (1994 Supp.), but from their being hold-over recipients under Sec. 3–205.42a(b) (1994 Supp.), the "grandfather

clause" included in the Act specifically to address the plight of pre-July 1, 1991 recipients. Under established canons of statutory construction, absent contrary legislative intent a general statutory provision will not take precedence over a controlling specific statutory provision. *See Graham v. Bernstein,* 527 A.2d 736, 739 (D.C. 1983). Therefore, we need not decide whether the 1991 legislation created implicitly a GPA benefits program of continuing eligibility subject to periodic review, as plaintiffs contend, or a series of separate, independent entitlements limited to each 12–month certification period, as defendants assert. For *these* plaintiffs, as set forth in the text above, the post-June 30, 1991 entitlement was *expressly* limited by D.C.Code § 3–205.42a(b) (1994 Supp.) to the recipient's current certification period.

ty.[14] D.C.Code § 3–205.53(c) (1994).

In attempting to distinguish the two statutes, plaintiffs state that, unlike the GPA program, Congress specifically declared in the legislative history of the food stamp program that it "is not a program of permanent or continuing eligibility subject to periodic review. It is a program of distinct and separate entitlements known as certification periods, which limit participation in the program." Appellees' Brief at 28 (quoting H.R. No. 95–464, 95th Cong. 1st Sess. 282 U.S.C.C.A.N. 1978, pp. 1704, 2217). This attempted distinction, in referring to "the GPA program" as a whole, paints with too broad a brush and, hence, is misleading. Both the legislative history and the express language of the hold-over provision, D.C.Code § 3–205.42a(b), limit the benefit entitlement of pre-July 1, 1991 recipients to the expiration of the current certification period.[15] Finally, plaintiffs point out that under D.C.Law 9–27, a recipient who has made a timely request for continuation of benefits shall continue to receive such benefits until the Mayor has acted upon the request—even if this does not occur until after the expiration of the certification period. D.C.Code § 3–205.53(c) (1994 Supp.). Plaintiffs assert that this feature establishes the GPA program as one of continuing eligibility. They argue that there is no counterpart to this provision in the federal food stamp program. This is only partially correct. The food stamp regulations, while not permitting continued benefits beyond the certification period, respond to bureaucratic delay in acting upon a timely reapplication for benefits by placing an affirmative obligation on state agencies to act within the requisite time and by restoring to the affected household one month's worth of lost benefits as a result of the delay. 7 C.F.R. § 273.14(e). This restoration-of-benefits provision did not deter the *Banks* court from finding the food stamp entitlement to be time-limited to each certification period. *Banks, supra,* 700 F.2d at 297. Nor does the continuation of payments pending agency action deter us from finding the GPA entitlement of these hold-over recipients time-limited to the expiration of their current certification period. Such a finding flows irrefutably from the express language of the "grandfather clause," D.C.Code § 3–205.42a(b) (1994 Supp.). Moreover, the continuation-of-payments provision was included in the statute to address one specific issue, namely, financial hardship occasioned by administrative delay. It requires too great a leap to infer from this simple act of legislative compassion a legislative intent that GPA benefits be of indefinite duration, particularly since a contrary intent is set forth so plainly in the statute itself. Simply put, at the end of the certification period then extant at the time D.C.Law 9–27 was enacted, these hold-over recipients had no "right" to continued benefits and stood under the statute in virtually the same posture as first-time applicants.[16] Under the law such an applicant to a government entitlement program has no constitutional right to receive benefits while his or her claim is being processed. *See*

---

14. The 1991 legislation did not eliminate the right to continue receiving GPA benefits pending appeal of a termination based on any reason other than non-disability. Therefore, we express no opinion as to how any "property right" claim, if raised following such a termination, should be resolved.

15. "This provision permits individuals currently receiving GPA benefits under the incapacity provision to continue to receive those benefits until their recertification period arrives. At that time, the individual must then meet the new criteria to be eligible." Crawford Committee Report at 10, referring to what is now codified as D.C.Code § 3–205.42a(b) (1994 Supp).

16. The trial court found that plaintiffs could not be considered like first-time applicants to a "new program" because, due to the manner in which D.C. Law 9–27 was implemented by DHS, there was no "new program". We need not resolve the trial-level semantics issue of whether this case involves a "new program," or simply new medical criteria to be applied in an ongoing program. Regardless of how one may characterize the "program," it is clear beyond peradventure that, at the expiration of their then-current certification periods, these hold-over recipients would be statutorily required, like every other applicant, to meet the new disability eligibility criteria. And that statutory requirement would remain, whatever may have been the conduct of DHS officials. It is in that sense that this Court holds they stand virtually in the same posture as first-time applicants.

*Lavine v. Milne,* 424 U.S. 577, 586, 96 S.Ct. 1010, 1016, 47 L.Ed.2d 249 (1976).

### B. *Property Interest, if Any, Derived from District's Implementation of D.C.Law 9–27*

■ According to the trial court's findings, following the enactment of D.C.Law 9–27, the District utilized the same recertification process, and used the same forms in that process, that it had used in the past. Moreover, it failed to advise those currently receiving GPA benefits or their doctors of the change in medical eligibility. Relying upon *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the court thereupon concluded that even if the 1991 legislation did not itself create a legitimate expectation or claim of entitlement to continued receipt of GPA benefits, the District's practice in implementing that legislation, as set forth above, did so. Reviewing the record de novo on this appeal from a grant of summary judgment, and giving defendants, as we must under *Holland v. Hannan,* 456 A.2d 807, 815 (D.C.1983), the benefit of all favorable inferences that can be drawn from the evidence, we are constrained to reject the trial court's conclusion.

The "process" simply involved DHS sending to each recipient, sixty days prior to the expiration of his or her certification period, a 60–day Notice enclosing two forms (a Social Information Report, to be executed by the recipient, and a Physical/Psychiatric Report, to be executed by the recipient's physician), a review of the executed forms by a DHS Medical Review Team upon the reapplication, and notice to the recipient of the Medical Review Team finding. Clearly there is nothing inherent in this process itself which would trigger any legitimate expectation of anything other than that the reapplication will, in due course, be acted upon by the Medical Review Team.

Nor do the forms create any such expectation. The General Public Assistance Notice (the 60–day Notice) in which the forms to be executed by the recipient and his or her physician are enclosed, instructs the recipient to return the two forms after they have been filled out. The Notice then states explicitly:

> After we receive your forms, if you are found eligible your checks will continue. If you are not found eligible, your checks will stop. Before we stop your checks, you will receive another notice explaining your rights.

As is seen from the quoted language, this Notice made abundantly clear to all those hold-over GPA recipients who reapplied for benefits that their reapplication may, or may not, be acted upon favorably.

As noted earlier in this opinion, the trial court found that, after the enactment of the 1991 legislation, neither recipients nor their doctors were informed by DHS that one could no longer qualify for GPA benefits based on incapacity. This omission, plaintiffs argue in their Brief, was particularly significant since the form to be filled out by the doctor, both before and after the enactment of D.C.Law 9–27, was the same, and it contained preprinted wording advising the doctor that it "will be used to determine continued eligibility ... predicated upon the physical or mental incapacitation of the client." As a result, plaintiffs assert, many physicians diagnosed an incapacity for patients who would have qualified as disabled. This argument, however, overlooks a critical fact. As Gwendolyn Hicks [17] testified in her deposition, the doctor, in filling out the Physical/Psychiatric Report form, is not to make a finding of incapacity or disability. That is done by the Medical Review Team. To assist the Medical Review Team in arriving at *its* determination, the pre-printed language on the form advises the executing doctor that "it is important that information be given relative to the exact nature and extent of the physical or mental incapacity". Under the GPA legislation in effect prior to July 1, 1991, a physical or mental "incapacitation" expected to last longer than 30 days was considered a "disability." However, neither before, nor after, July 1, 1991 was the doctor to concern himself with these labels. Rather, he was merely to report the nature and

---

**17.** Supervisory Social Service Representative, Recertification Section, Income Maintenance Administration, Department of Human Services.

extent of the impairment, and defer to the Medical Review Team to apply the appropriate label.[18] Finally, under the 1991 statute, once the hold-over recipient's current certification period ended there was no right to continued benefits unless the recipient met the new disability standard. Given this clear legislative mandate, plaintiffs could not have had any legitimate expectation that benefits would continue beyond that period—whatever may have been the conduct of, or forms used by, DHS during the recertification process. *See DeLao, supra,* 560 F.2d at 1388–89 (citing *Roth, supra,* 408 U.S. at 578, 92 S.Ct. at 2709); *Williams v. Barry,* 490 F.Supp. 941 (D.D.C.1980), *modified,* 708 F.2d 789 (D.C.Cir.1983).

## IV.

### *Adequacy of Notice*

Beginning in mid-July, 1991, DHS mailed to each member of plaintiff class essentially the same Notice of Action terminating his or her GPA benefits, effective at the end of their current certification period. It stated, in part, "[T]he reason for this termination is because, based on the medical information you provided, you were not determined to be disabled." Omitted therefrom was any specification of the factual basis upon which DHS concluded that any particular recipient was not disabled.[19] The trial court, citing *Goldberg, supra,* found these factually non-specific boilerplate notices to be constitutionally inadequate to satisfy the Due Process Clause of the Fifth Amendment.[20] The District concedes on appeal that the Notice was inadequate.[21]

## V.

### *Lump–Sum Retroactive Payment*

Finding that plaintiffs were denied procedural due process, the trial court ordered the

---

18. It bears noting that, notwithstanding the seemingly limiting "physical or mental *incapacitation*" pre-printed language on the Physical/Psychiatric Report form, over 300 of the members of plaintiff class had been found to be suffering from a "disability" by the Medical Review Team under the pre–1991 legislation.

19. The initial notices also contained internally contradictory language advising recipients in one paragraph that benefits would, and in another paragraph that benefits would not, continue in effect pending administrative appeal of non-disability findings. This contradiction was removed by a corrected Notice issued by DHS on November 14, 1991.

20. This ruling was made against the backdrop of another troubling notice matter. Prior to the terminations at issue herein, GPA recipients had not been sent any individual notice (notices were merely posted in GPA benefit offices at DHS) by DHS advising them that new legislation was now in effect which eliminated incapacity as a basis for GPA benefits and re-defined the disability criteria. The Notice issued on November 14, 1991, so advising, came *after* the terminations. Even if this lack of prior notice passes constitutional and statutory muster (it is not an issue raised in this appeal), it demonstrates a deplorable lack of sensitivity on the part of DHS toward the population it serves.

21. The record on appeal is ambiguous as to whether this was a concession that the notice was constitutionally inadequate or only statutorily inadequate, under D.C.Code § 3–205.55 (1994 Supp.). There are two references in Appellant's Brief to the notice deficiency. Footnote 11 at page 13 reads, in pertinent part:

> The Superior Court found that recipients were entitled to know the basis of the (non-disability) determination, and the District does not challenge that ruling on appeal.

Footnote 14 at page 19 reads in its entirety as follows:

> As noted above, the Superior Court also found that the notice provided to GPA recipients was constitutionally deficient. Any problem with the notice, however, was corrected by the District's compliance with the terms of the permanent injunction. Thus, the District is not challenging the court's ruling with respect to the notices on appeal.

While the latter footnote would seem to indicate a concession of constitutional inadequacy, this interpretation would be at odds with the central core of the District's principal argument on appeal, namely, that plaintiffs were not denied procedural due process (including the "adequate notice" component thereof) because, possessing no property interest to the continued receipt of GPA benefits beyond their certification period, no "process" was due them regarding a termination effective at the end of such period. Unfortunately, oral argument shed little light on the ambiguity, the District's lawyer stating merely, "we are not contesting that the agency doesn't have to provide notice". In any event, having found persuasive and therefore accepted the District's contention that plaintiffs possessed no constitutionally protectable property interest, we view the District's "notice inadequacy" concession, notwithstanding the confusing footnotes in its Brief, to be limited to the violation of D.C.Code § 3–205.55 (1994 Supp.) only.

reinstatement of benefits to those members of plaintiff class who preserved their rights [22] and whose benefits were terminated without adequate notice and opportunity for a pretermination hearing. It further ordered the District to pay these class members a lump-sum "retroactive sum of money equal to all such benefits that were not paid from the effective date of termination until the date of actual reinstatement." On January 22, 1993, this court granted the District's motion to stay the Superior Court's order requiring lump-sum retroactive payments. We now reverse that order.

▉ The following excerpt from the trial court's opinion of September 8, 1992, clearly illustrates the significant impact its finding that the District violated plaintiffs' Due Process rights had upon the court's retroactive payment order:

A fifth, unrelated reason is the matter of consistency in the Court's legal analysis. Stated simply, if the Court finds that there have been unconstitutional violations that directly caused the cessation of benefits, there is no intellectually consistent reason to sanction the nonpayment by not requiring the disbursal of the money that should have been paid out. If the termination of payments was unconstitutional, such illegal government action cannot be rewarded (or the harm cheapened) by the refusal to impose monetary reparations.

Since we reject the trial court's finding that the District acted "unconstitutionally," we need not decide the correctness of its legal conclusion that the harm of such an unconstitutional violation would be "cheapened" by a refusal to impose monetary reparations. Rather, the question before us is whether the retroactive payment order can be sustained as a permissible remedy for the conceded violation of the "Adequate Notice" provision

of D.C.Code § 3–205.55(a) (1994 Supp.) [23] The answer is, no. Contrary to the conclusion of the lower court, this case does not involve any violation, constitutional or statutory, which "directly caused the cessation of benefits." It was the failure of the plaintiffs to meet the new disability criteria required by D.C.Law 9–27 that caused the cessation of benefits, not the failure of DHS *thereafter* to provide them with detailed, fact-specific notices setting forth the reasons for the non-disability findings and spelling out, in non-contradictory language, the recipient's appeal rights. In *Foggs v. Block*, 722 F.2d 933 (1st Cir.1983), *rev'd on other grounds sub nom. Atkins v. Parker*, 472 U.S. 115, 105 S.Ct. 2520, 86 L.Ed.2d 81 (1985), the United States Court of Appeals for the First Circuit denied restitution under similar circumstances, even though the notice involved there was constitutionally deficient. In *Foggs*, the Massachusetts Department of Public Welfare sent notices to food stamp recipients advising them that their benefits may be reduced or terminated as a result of an August, 1981 amendment to the Food Stamp Act which reduced the earned income deduction from twenty to eighteen percent. The District Court found these notices to be constitutionally defective and ordered restoration of benefits pending the delivery of constitutionally adequate notices. On appeal, the First Circuit agreed that the notices were constitutionally deficient, but reversed the trial court on the issue of the proper remedy, stating:

The restoration of benefits to all recipients was unwarranted, given the absence of any showing that a substantial percentage of these recipients had their benefits improperly reduced or terminated. Restoration of benefits would constitute a windfall to recipients and would result in the continua-

---

**22.** Certain class members were deemed to have preserved their rights either by appealing their terminations or, for those who instead reapplied for benefits, by appealing the denial of such reapplication.

**23.** D.C.Code § 3–205.55(a) (1994 Supp.) reads, in pertinent part:

The Mayor shall give timely and adequate notice in case of intended action to ... terminate ... assistance ...

(2) "Adequate" means that the written notice includes a statement of what action the Mayor intends to take, the reasons for the intended action, the specific law and regulations supporting the action, an explanation of the individual's right to request a hearing, and the circumstances under which assistance will be continued if a hearing is requested.

tion of benefits at a level exceeding that authorized by Congress.

*Foggs,* 722 F.2d at 941.

In its attempt to distinguish *Foggs,* the trial court in this case commented in its opinion accompanying the Permanent Injunction:

Second, the instant class action is certainly not the kind of case in which there is doubt that "a substantial percentage of these recipients had their benefits improperly reduced or terminated." All of the class members were denied a pretermination hearing, without any exception or qualification. This constitutional violation was uniform to all class members. Furthermore, they all received the same boilerplate notices that were misleading also in uniform fashion.

(internal citations omitted). But this attempted distinction misses the mark. The Circuit Court in *Foggs* was not referring to whether a substantial percentage of food stamp recipients were terminated improperly due to lack of notice or pretermination hearings. The "absence" it referred to was of benefit reductions stemming from agency miscalculations.[24] In addition, *Foggs* also reasoned that a restoration of benefits would constitute a windfall to recipients, and would result in the continuation of benefits at a level exceeding that authorized by Congress. That is no less true in this case. The District of Columbia Council has authorized GPA benefits only for those persons found disabled under D.C.Law 9–27. To provide retroactive payments to those class members who do not satisfy this disability standard is to ignore the Council's substantive limitation on who should receive GPA benefits. Such an award is particularly unwarranted where, as here, (1) the financially-strapped District in all likelihood would be unable to recover any retroactive payments made to those class members who were unsuccessful in their administrative appeals of non-disability findings, and (2) the 1991 statute itself, at Section 3–208.1 (1994 Supp.), allows for retroactive payments where the recipient *does*

prevail in his administrative appeal of a non-disability finding.

Finally, such an award cannot be justified under a "balancing of the equities," as was done in *Archer v. District of Columbia Dep't. of Human Resources,* 375 A.2d 523 (D.C. 1977). The retroactive payment was to cover benefits not paid from the effective date of termination (*i.e.,* end of certification period) until the date benefits resumed under the reinstatement order. A balancing of the equities had already been done by the D.C. Council when, in 1991, with the city facing a financial crisis, it enacted what is now D.C.Code § 3–205.53(c) (1994 Supp.), eliminating the "incapacity" medical criteria and repealing that provision of the Public Assistance Act of 1982 which allowed benefits to continue pending administrative appeals of non-disability findings. The Council was well aware of the impecunious status of the population that would be affected by this repeal as well as the elimination of the incapacity eligibility standard for GPA benefits. But, as noted in the Crawford Committee Report, at 19:

(Council Chairman John Wilson) stated that the present financial situation calls for some hard, unpopular decisions, and that this one is one of the first that the Council will have to make.

Earlier in this opinion we upheld the constitutionality of D.C.Code § 3–205.53(c) (1994 Supp.), one of the statutory mandates resulting from those "hard, unpopular" decisions. It precludes the payment of GPA benefits during the pendency of non-disability administrative appeals. We now conclude that the trial court abused its discretion in awarding lump-sum retroactive payments covering any portion of that period as a remedy for what was no more than a violation of the "adequate notice" provision of D.C.Code § 3–205.55 (1994 Supp.). *See District of Columbia v. Gray,* 452 A.2d 962 (D.C.1982) (reversing an award of back pay to teacher discharged in violation of statute).

---

**24.** In the instant case, although plaintiffs allege in their Brief, at 9, that a disproportionate share of terminations of GPA benefits by DHS were erroneous, specific allegations of error are made only in reference to the four named plaintiffs and one other person. Even if proven, this is hardly "substantial," under *Foggs* or any other yardstick.

## VI.

### *The Cross–Appeal*

By order entered October 27, 1992 on the District's Motion for Clarification, the trial court modified the Permanent Injunction of September 8, 1992 by excluding from its reinstatement coverage those members of plaintiff class who, upon receiving termination notices from DHS, reapplied for GPA benefits but failed to appeal the denials of their reapplications. In their cross-appeal, plaintiffs contend that the trial court erred in making this exclusion. We disagree and affirm.

Those persons who failed to appeal a denial of their reapplication effectively abandoned any claim that they were entitled to a continuation of benefits. There is no sound reason to require the District to expend its scarce resources providing GPA benefits to persons who, for whatever reason, are no longer contending that they are entitled to them. The trial court's refusal to order the District to do so was clearly a reasonable exercise of its equitable powers.

## VII.

### *Conclusion*

For the foregoing reasons, on defendants' appeal we reverse and remand, with instructions that the trial court modify the Permanent Injunction in accordance with this opinion.

On plaintiffs' cross-appeal, we affirm.