******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

FRANCIS SHANNON *v.* COMMISSIONER
OF HOUSING
(SC 19562)

Rogers, C. J., and Palmer, Zarella, Espinosa and Robinson, Js.

*Argued February 23—officially released August 2, 2016*

*Cecil J. Thomas*, for the appellant (plaintiff).

*Alan N. Ponanski*, assistant attorney general, with whom, on the brief, was *George Jepsen*, attorney general, for the appellee (defendant).

*Amy Eppler-Epstein* and *Jane Shim*, law student intern, filed a brief for the New Haven Legal Assistance Association, Inc., et al. as amici curiae.

*Opinion*

ROBINSON, J. The defendant, the Commissioner of Housing,[1] administers the state rental assistance program (rental program), which, like the federal program operated pursuant to § 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f (section 8 program), provides "rental assistance for low-income families living in privately-owned rental housing." General Statutes (Supp. 2016) § 8-345 (a);[2] see also, e.g., *Commission on Human Rights & Opportunities* v. *Sullivan Associates*, 250 Conn. 763, 769–70, 739 A.2d 238 (1999) (discussing section 8 program). In this appeal, we consider whether the defendant may terminate rental program assistance to a registered sex offender who had that status when he was admitted to the rental program prior to the promulgation of § 17b-812-13 (9) of the Regulations of Connecticut State Agencies,[3] which makes sex offender registration a ground for termination or denial of rental program assistance. The plaintiff, Francis Shannon, appeals[4] from the judgment of the trial court dismissing his administrative appeal from the decision of the defendant to terminate his rental program assistance. On appeal, the plaintiff claims, inter alia, that the trial court improperly concluded that the defendant's application of § 17b-812-13 (9) of the regulations was not retroactive and, thus, did not exceed the authority granted to the defendant by the legislature. We conclude that the relevant statutes, regulations, and agency policies demonstrate that the defendant applied § 17b-812-13 (9) of the regulations retroactively by imposing a new obligation on the plaintiff's sex offender status that terminated his rental program assistance, and that the legislature did not authorize such retroactive agency action. Accordingly, we reverse the judgment of the trial court.

The record reveals the following undisputed facts and procedural history. The plaintiff, who has been a registered sex offender since 1997,[5] is legally blind and suffers from a variety of serious illnesses. He relies on disability and food stamp benefits for income. In 2008, the plaintiff, who had been living under a bridge, began to receive assistance from Hands on Hartford, Inc., a nonprofit agency, which placed him in a congregate housing setting and later helped him apply for the rental program. In 2009, the Department of Social Services, which administered the rental program at the time, gave the plaintiff a certificate admitting him into the rental program, which helped him to live independently in an apartment with supportive services.

When the plaintiff entered the rental program, the Department of Social Services did not have a regulation or formal policy in the administrative plan for the rental assistance program (administrative plan) establishing sex offender registration as a ground for denial or termination of assistance.[6] In December, 2012, however, the Department of Social Services promulgated § 17b-812-

13 (9) of the regulations, which provides for the denial of assistance to an applicant or the termination of assistance to a participant if "a household family member is subject to a registration requirement under a state or federal sex offender registration program." The defendant subsequently assumed responsibility for the rental program from the Department of Social Services. See Public Acts 2013, No. 13-234, § 2.[7]

On July 24, 2013, John D'Amelia Associates, a contractor that manages the rental program as an agent of the defendant in conjunction with several local housing authorities, notified the plaintiff that his participation in the rental program would terminate effective July 31, 2013. The plaintiff timely exercised his right to an administrative hearing and, following a series of administrative remands and motions for reconsideration, the defendant issued a final decision on May 1, 2014. In that decision, the defendant found that the plaintiff's "extenuating circumstances [were] not sufficient to warrant the continuation of his [rental program] benefits."[8] Accordingly, the defendant ordered the termination of the plaintiff's rental program benefits effective May 31, 2014.

The plaintiff took an administrative appeal from the decision of the defendant to the trial court pursuant to General Statutes § 4-183, claiming, inter alia, that the defendant had applied § 17b-812-13 (9) of the regulations retroactively in a manner that was impermissible because it was not legislatively authorized. Relying on *Landgraf* v. *USI Film Products*, 511 U.S. 244, 269–70, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994), and *Bhalerao* v. *Illinois Dept. of Financial & Professional Regulations*, 834 F. Supp. 2d 775, 783–84 (N.D. Ill. 2011), the trial court concluded that the defendant's application of § 17b-812-13 (9) of the regulations was "not retroactive. It does not require reimbursement of or otherwise penalize past receipt of [rental program] benefits. Nor does it affect anyone based on his or her prior listing on a sex offender registry" insofar as "it applies only to persons contemporaneously on a sex offender list."[9] The trial court, therefore, determined that it "need not address the question of whether the [defendant] had authority to enact a retroactive regulation." After rejecting the plaintiff's numerous other claims,[10] the trial court rendered judgment dismissing the plaintiff's administrative appeal. This appeal followed.[11]

Although the plaintiff presents several issues in this appeal,[12] we find dispositive his claim that the trial court improperly concluded that the defendant's application of § 17b-812-13 (9) of the regulations to terminate his rental program assistance was not retroactive, in excess of the rule-making authority conferred on the defendant by the legislature. Citing the long-standing presumption against retroactive legislation embodied in General Statutes § 55-3;[13] see, e.g., *D'Eramo* v. *Smith*, 273 Conn.

610, 620–21, 872 A.2d 408 (2005); the plaintiff argues that the defendant applied § 17b-812-13 (9) of the regulations in a manner that "takes away or impairs vested rights, acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past . . . ." (Internal quotation marks omitted.) *Landgraf* v. *USI Film Products*, supra, 511 U.S. 269. The plaintiff contends that the trial court's determination that the application of § 17b-812-13 (9) of the regulations was not retroactive, because it did not penalize the plaintiff's earlier receipt of rental program benefits or require him to repay them, is inconsistent with the United States Supreme Court's immigration decisions in *Vartelas* v. *Holder*, U.S. , 132 S. Ct. 1479, 182 L. Ed. 2d 473 (2012), and *Immigration & Naturalization Service* v. *St. Cyr*, 533 U.S. 289, 121 S. Ct. 2271, 150 L. Ed. 2d 347 (2001), and this court's pension decision in *Gormley* v. *State Employees Retirement Commission*, 216 Conn. 523, 582 A.2d 764 (1990). The plaintiff also argues that, before § 17b-812-13 (9) of the regulations was promulgated, the governing statute, regulations, and policies afforded him a property interest in continued participation in the rental program that had vested with his admission to the rental program in 2009, observing that Congress barred the admission of registered sex offenders into the similar section 8 program; see 42 U.S.C. §§ 13663 (a) and 13664 (a) (2) (B); but did not "authorize . . . the termination of existing participants subject to a registry obligation." See also *Miller* v. *McCormick*, 605 F. Supp. 2d 296, 312–13 (D. Me. 2009). The plaintiff emphasizes that the trial court "speculative[ly]" focused on the plaintiff's lack of reliance on the rental program in 1997 when he pleaded guilty to a sex offense, rather than the "settled expectations and reasonable reliance" created by the law effective at the time of his admission to the rental program in 2009, particularly given his dependence on the assistance provided through the rental program.[14]

In response, the defendant contends that the decision to terminate the plaintiff's rental program assistance pursuant to § 17b-812-13 (9) of the regulations was prospective under *Landgraf* v. *USI Film Products*, supra, 511 U.S. 269–70. The defendant relies on a grant renewal case, *Ohio Head Start Assn.*, *Inc.* v. *United States Dept. of Health & Human Services*, 873 F. Supp. 2d 335 (D.D.C. 2012), aff'd, 510 Fed. Appx. 1 (D.C. Cir. 2013), and a series of Illinois cases upholding the revocation of professional licenses as a consequence of certain preexisting criminal convictions. See, e.g., *Bhalerao* v. *Illinois Dept. of Financial & Professional Regulations*, supra, 834 F. Supp. 2d 775. The defendant further emphasizes that, although "the termination looks back in time in that it considers a prior conviction, it does not make [the plaintiff's] termination effective from a past date or alter his participation in the [rental] pro-

gram from 2009 until the time of his termination. This is especially true given that [the defendant] has not asked [the] plaintiff to repay any [rental program benefits] he received prior to his termination." Citing, inter alia, *Ridgely* v. *Federal Emergency Management Agency*, 512 F.3d 727 (5th Cir. 2008), and *Colson* v. *Sillman*, 35 F.3d 106 (2d Cir. 1994), the defendant further argues that the plaintiff has no vested property right in his benefits because the rental program is "not an entitlement program" and its participants are not "automatically entitled to a continuation of benefits," insofar as the defendant maintains continuing discretion to deny or terminate assistance. Thus, the defendant contends that the plaintiff had "no 'settled expectation' or 'reasonable reliance' on his ongoing participation in [the rental program]," and that the plaintiff's interpretation of the rules would preclude "the government from modifying its policy to serve other deserving constituencies with limited dollars." We, however, agree with the plaintiff, and conclude that the defendant's application of § 17b-812-13 (9) was retroactive and, therefore, not authorized by the legislature.

We begin with the standard of review. The trial court's determination of whether the defendant's application of § 17b-812-13 (9) of the regulations had a retroactive effect is a question of law over which we exercise plenary review. See, e.g., *Durable Mfg. Co.* v. *United States Dept. of Labor*, 578 F.3d 497, 502–503 (7th Cir. 2009); *BellSouth Telecommunications, Inc.* v. *Southeast Telephone, Inc.*, 462 F.3d 650, 657 (6th Cir. 2006); accord *Lane* v. *Commissioner of Environmental Protection*, 314 Conn. 1, 16, 100 A.3d 384 (2014).

As the plaintiff observes, § 55-3 provides that: "No provision of the general statutes, not previously contained in the statutes of the state, which imposes *any new obligation* on any person or corporation, shall be construed to have a retrospective effect." (Emphasis added.) It is well established that § 55-3 is "a rule of presumed legislative intent that statutes affecting substantive rights shall apply prospectively only. . . . The rule is rooted in the notion that it would be unfair to impose a substantive amendment that changes the grounds upon which an action may be maintained on parties who have already transacted or who are already committed to litigation."[15] (Internal quotation marks omitted.) *Investment Associates* v. *Summit Associates, Inc.*, 309 Conn. 840, 867–68, 74 A.3d 1192 (2013); see also *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 426, 119 A.3d 462 (2015) (Connecticut law "embraces the constitutional permissibility of 'manifestly just' retroactive legislation affecting existing legal rights and obligations").

This presumption against the retroactive application of statutes applies similarly to regulations that impose, in the parlance of § 55-3, "new obligation[s] . . . ." See,

e.g., *Bowen* v. *Georgetown University Hospital*, 488 U.S. 204, 208, 109 S. Ct. 468, 102 L. Ed. 2d 493 (1988); accord *Sarrazin* v. *Coastal, Inc.*, 311 Conn. 581, 610, 89 A.3d 841 (2014) (same principles govern interpretation of statutes and regulations). Indeed, "a statutory grant of legislative [rule-making] authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by [the legislature] in express terms. . . . Even where some substantial justification for retroactive [rule making] is presented, courts should be reluctant to find such authority absent an express statutory grant." (Citation omitted.) *Bowen* v. *Georgetown University Hospital*, supra, 208–209. Thus, "[w]hen, as here, an administrative rule is at issue, the inquiry is two-fold: whether [the legislature] has expressly conferred power on the agency to promulgate rules with retroactive effect and, if so, whether the agency clearly intended for the rule to have retroactive effect." *Durable Mfg. Co.* v. *United States Dept. of Labor*, supra, 578 F.3d 503.

Because the defendant does not argue that the legislature authorized retroactive regulations with respect to the rental program, resolution of this issue turns on whether § 17b-812-13 (9) of the regulations was, in fact, retroactively applied to terminate the plaintiff's assistance on the basis of his status as a registered sex offender.[16] As the trial court recognized, the United States Supreme Court's decision in *Landgraf* v. *USI Film Products*, supra, 511 U.S. 244, furnishes the leading articulation of when a new law has been applied retroactively. "While statutory retroactivity has long been disfavored, deciding when a statute operates 'retroactively' is not always a simple or mechanical task." Id., 268. Consistent with the "new obligation" focus under § 55-3, the Supreme Court stated that a "statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment . . . or upsets expectations based in prior law. *Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment.* The conclusion that a particular rule operates 'retroactively' comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event. Any test of retroactivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity." (Citation omitted; emphasis added; footnote omitted.) Id., 269–70. "However, retroactivity is a matter on which judges tend to have sound . . . instinct[s] . . . and familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance."[17] (Citation omitted; internal quotation marks omitted.) Id., 270.

The Supreme Court explained further that "[t]he presumption against statutory retroactivity has consistently been explained by reference to the unfairness of imposing new burdens on persons after the fact." Id.; accord *D'Eramo* v. *Smith*, supra, 273 Conn. 620 n.8 ("the presumption against retroactivity is rooted in common-law notions of fairness that have general application," including that "individuals should have an opportunity to know what the law is and to conform their conduct accordingly" and that "settled expectations should not be lightly disrupted" [internal quotation marks omitted]); *Miano* v. *Thorne*, 218 Conn. 170, 176, 588 A.2d 189 (1991) ("[t]he rule is one of obvious justice and prevents the assigning of a quality or effect to acts or conduct which they did not have or did not contemplate when they were performed" [internal quotation marks omitted]). The court observed that "[t]he largest category of cases in which we have applied the presumption against statutory retroactivity has involved new provisions affecting contractual or property rights, matters in which predictability and stability are of prime importance." *Landgraf* v. *USI Film Products*, supra, 511 U.S. 271. Put differently, under *Landgraf*, a law has retroactive effect when it "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." Id., 280; accord *Rudewicz* v. *Gagne*, 22 Conn. App. 285, 290–91, 582 A.2d 463 (1990) (applying § 55-3 and concluding that "[w]e cannot now declare that the defendants' property rights were invalidated by a statute [governing discontinuance of public highways, which] was passed nearly fifty years after those rights had vested"). Finally, the "*Landgraf* analysis applies equally to administrative rules." *Durable Mfg. Co.* v. *United States Dept. of Labor*, supra, 578 F.3d 503 n.9; see also *Bruh* v. *Bessemer Venture Partners III L.P.*, 464 F.3d 202, 213 (2d Cir. 2006), cert. denied, 549 U.S. 1209, 127 S. Ct. 1334, 167 L. Ed. 2d 81 (2007).

We begin by noting our disagreement with the defendant's purely temporal argument, which is echoed by the dissent, namely, that the application of § 17b-812-13 (9) of the regulations to terminate the plaintiff's rental program assistance was not retroactive under *Landgraf* because the defendant did not seek repayment of past benefits, and there is no indication of a relationship between the plaintiff's guilty plea in 1997 and his decision to seek rental program assistance in 2009. The defendant and the dissent rely on a line of Illinois cases, following *Bhalerao* v. *Illinois Dept. of Financial & Professional Regulations*, supra, 834 F. Supp. 2d 782–83, that examine a statute revoking, by operation of law, the professional licenses of healthcare providers who had certain criminal convictions, and conclude that the application of that statute to providers who had preexisting convictions was not ret-

roactive. See, e.g., *Hayashi* v. *Dept. of Financial & Professional Regulation*, 25 N.E.3d 570, 578–79 (Ill. 2014), cert. denied,    U.S.    , 135 S. Ct. 2868, 192 L. Ed. 2d 897 (2015). These courts reasoned that it was not retroactive to apply the statute in this manner because it did not affect the legality of practice or divest any earnings from the period of time between the conviction and the enactment of the statute. See, e.g., id.; see also *Bhalerao* v. *Illinois Dept. of Financial & Professional Regulations*, supra, 782–83. The court in *Bhalerao* also described it as "superficial to argue that [a physician] 'might have decided not to commit' the battery 'or might have resisted conviction more vigorously' had he known that he faced not only criminal penalties but also might not be entitled to the exercise of [the licensing board's] discretion in regard to whether his license would be revoked."[18] *Bhalerao* v. *Illinois Dept. of Financial & Professional Regulations*, supra, 784.

We agree with the plaintiff's contention in his reply brief that the reliance based analysis in *Bhalerao*, focusing strictly on the time of the guilty plea, is overly rigid and wholly inconsistent with the broader, more realistic approach taken by the Supreme Court in *St. Cyr* and *Vartelas*, which specifically rejected "[s]uch categorical arguments [as] not particularly helpful in undertaking *Landgraf*'s commonsense, functional retroactivity analysis."[19] *Immigration & Naturalization Service* v. *St. Cyr*, supra, 533 U.S. 324; see also *Vartelas* v. *Holder*, supra, 132 S. Ct. 1489–91 (concluding that statutory change that effectively precluded lawful permanent residents with convictions of crimes of moral turpitude from traveling abroad for short durations by creating potential barrier to reentry was retroactive because it constituted " 'new disability' " and " 'new legal consequence' " for conviction obtained years before change); *Immigration & Naturalization Service* v. *St. Cyr*, supra, 324–26 (rejecting government's argument that deportation proceedings are " 'inherently prospective' " such that "application of the law of deportation can never have a retroactive effect," in holding that 8 U.S.C. § 212 [c], which prior to its repeal provided for discretionary relief from deportation, "remains available for aliens . . . whose convictions were obtained through plea agreements and who, notwithstanding those convictions, would have been eligible for § 212 [c] relief at the time of their plea under the law then in effect"). Indeed, another federal court has recently criticized and distinguished retroactivity analysis in *Bhalerao* by concluding that it was impermissibly retroactive under the "new legal consequences" test of *Landgraf* to apply a statute suspending the driver and professional licenses of those with tax delinquencies to current tax delinquents on the ground of prior debts. See *Berjikian* v. *Franchise Tax Board*, 93 F. Supp. 3d 1151, 1159–60 (C.D. Cal. 2015). Accordingly, we view the rigidity of the *Bhalerao* approach as inconsistent with the Supreme

Court's later *Landgraf* cases, particularly with respect to continued access to a government benefit.

Thus, whether the application of a new law to restrict or terminate future access to a government benefit on the basis of past events operates retroactively—by creating a "new obligation" in the parlance of § 55-3—depends on the extent to which the law interferes with the "present right to future benefits . . . ." *Gormley* v. *State Employees Retirement Commission*, supra, 216 Conn. 532. Applying this standard, this court concluded in *Gormley* that it was impermissibly retroactive under § 55-3 to apply General Statutes § 51-287 (e), which the legislature enacted to end pension " 'double-dipping,' "[20] to terminate a prosecutor's pension, which a state judge was collecting along with his judicial salary. Id., 527–28. The court emphasized that, "[i]t is undisputed that prior to the enactment of § 51-287 (e), the [judge] would have been entitled to collect both his retirement income and a salary upon being appointed," and held that the "dispositive fact is not that [he] was appointed as a judge seventeen months after that enactment, *but that seven years earlier, when he had retired as chief state's attorney, he was statutorily entitled to receive a pension.* . . . He then began receiving his pension, and it is the provisions of the plan at that time that are controlling on him. The application of § 51-287 (e) would impose upon the [judge] a new obligation, that of choosing between the continuing receipt of his pension benefits or accepting a judgeship, an obligation to which he was not subject prior to its passage. . . . [His] substantive right to continue to receive his pension regardless of his future employment would be implicated by the imposition of this new obligation." (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 529–30. The court rejected the retirement commission's argument that a "statute suspending pension benefits that one is already receiving has no retrospective effect simply because that suspension will occur upon the happening of a future event. It takes little imagination to recognize that such a rule would set such benefits down a slippery slope that would undermine legitimate and settled expectations." Id., 532.

To determine the extent to which § 17b-812-13 (9) of the regulations created a new obligation by interfering with the plaintiff's present right to receive future benefits, we now examine the terms of the rental program, under the applicable statutes, regulations, and agency policies, as set forth in the 2011 revision of the administrative plan. Dept. of Social Services, Administrative Plan for the Rental Assistance Program (July 1, 2011) pp. 15-1 through 15-2; see footnote 6 of this opinion; see also *Durable Mfg. Co.* v. *United States Dept. of Labor*, supra, 578 F.3d 503–504 (change in labor certification requirements for visa petitions not retroactively applied when previous regulation had stated that "approved labor certifications were valid 'indefinitely' "

because "indefinite" is not synonymous with "permanently valid," meaning that "any expectations that the plaintiffs had regarding the continued validity of their labor certifications were not settled due to the unfixed character of the old regulation"); *Ridgely* v. *Federal Emergency Management Agency*, supra, 512 F.3d 737–39 (determining whether "property interest in a stream of benefits" was created by statutes, regulations, and agency practices that would entitle recipient to "receive recurring . . . payments upon an initial showing of eligibility"); *Ohio Head Start Assn., Inc.* v. *United States Dept. of Health & Human Services*, supra, 873 F. Supp. 2d 350–51 (examining statutes and regulations governing early childhood educational grant program, determining that new criteria for renewal were not applied retroactively, and stating that recipients "cannot credibly argue the [regulation] confirmed or created any entitlement to automatic renewal of [their] grants" and that "[a]bsent any formal or informal grounds on which to base its purported entitlement to automatic renewal of [their] grants, the [recipients] have no protected property interest").

We begin with the enabling statute, § 8-345; see footnote 2 of this opinion; which requires the defendant to "implement and administer a program of rental assistance for low-income families living in privately-owned rental housing"; General Statutes (Supp. 2016) § 8-345 (a); and directs the defendant to adopt regulations, including those to "establish maximum income eligibility guidelines for such rental assistance and criteria for determining the amount of rental assistance which shall be provided to eligible families." General Statutes (Supp. 2016) § 8-345 (g). The enabling statute itself does nothing to limit the participants' rights to remain enrolled and receive a future stream of benefits from the rental program, so long as the rental program is funded. See General Statutes (Supp. 2016) § 8-345 (f) ("[n]othing in this section shall give any person a right to continued receipt of rental assistance at any time that the program is not funded"); accord Regs., Conn. State Agencies § 17b-812-2 (b) ("The commissioner . . . shall limit the issuance of rental assistance certificates to eligible families based upon the availability of funds. A certificate does not guarantee a family the right to participate in the program. The commissioner or the commissioner's agent may suspend or cancel an issued certificate if a change in an applicant's circumstances results in ineligibility prior to execution of the rental assistance contract. The commissioner may suspend or cancel issued certificates based on lack of funds.").

Contrary to the arguments of the defendant, neither the regulations nor the agency policies stated in the administrative plan provide a durational limit on recipients' enrollment in the rental program, once they have requested and received approval of appropriate housing

within the period prescribed by the admission regulation; see Regs., Conn. State Agencies § 17b-812-5 (c) through (e);[21] following receipt of the certificate, upon selection from the waiting list, confirming their eligibility. Although § 17b-812-9 of the Regulations of Connecticut State Agencies[22] mandates an annual reexamination of the recipients' income and family composition, which are factors determining the amount of assistance to be given from year to year, nowhere does it or the corresponding portion of the administrative plan impose a restriction on recipients' continued enrollment in the rental program once they are admitted initially and begin to receive assistance.[23] Indeed, the defendant's suggestion of a one year durational limit on eligibility for the rental program is inconsistent with the regulations prescribing those housing arrangements that are eligible for the benefit, which require a rental agreement of "*not less* than one year."[24] (Emphasis added.) Regs., Conn. State Agencies § 17b-812-8 (b). Thus, to avoid becoming subject to termination in accordance with § 17b-812-13 of the regulations; see footnote 3 of this opinion; rental program recipients need only "comply with [the obligations set forth in § 17b-812-12 (b) and (c)] in order to continue participating . . . ." Regs., Conn. State Agencies § 17b-812-12 (a); see also id., § 17b-812-12 (b) and (c) (setting forth obligations).[25] Accordingly, nothing in the regulations governing the rental program suggests that enrollment therein is for a limited duration such that the termination of his future benefits did not constitute a new obligation or legal consequence for the plaintiff.

The defendant contends, however, that consistent with the regulations' description of the rental program as a "non-entitlement program"; id., § 17b-812-2 (a); a "participant is not automatically entitled to a continuation of benefits" insofar as the rental program has "specific rules that a participant must follow to receive assistance." The defendant posits that the regulations and the 2011 revision of the administrative plan "clearly enumerate the grounds and procedure for termination at any time" insofar as the defendant "may exercise discretion in the decision of whether to deny or terminate assistance." We disagree. First, the defendant's reliance on the "non-entitlement" language in § 17b-812-2 (a) is inapposite, given that the plaintiff is an approved recipient, rather than a mere applicant, for rental program benefits.[26] See, e.g., *Abreu* v. *Callahan*, 971 F. Supp. 799, 825 (S.D.N.Y. 1997) ("[a] legitimate claim of entitlement to a government benefit therefore exists where a claimant satisfies the qualifications for the benefit and the granting official lacks discretion to reject a qualified applicant"); see also Regs., Conn. State Agencies § 17b-812-2 (b) ("A certificate does not guarantee a family the right to participate in the program. The commissioner or the commissioner's agent may suspend or cancel an issued certificate if a change in

an applicant's circumstances results in ineligibility prior to execution of the rental assistance contract."). Second, the defendant fails to read in context the cited portion of the 2011 revision of the administrative plan, which simply emphasizes that the agency administering benefits for the defendant has discretion to not terminate assistance as a result of the enumerated grounds, such as the breach of one of the family's obligations under the program.[27] See Dept. of Social Services, Administrative Plan for the Rental Assistance Program (July 1, 2011) pp. 15-1 through 15-10. Put simply, nothing in the statute, regulations, or 2011 revision of the administrative plan supports the defendant's argument that, once admitted and given the benefit of an executed rental assistance contract; see Regs., Conn. State Agencies § 17b-812-2 (b); a recipient's continued participation in the rental program is a time-limited or otherwise tenuous expectation subject to the annual exercise of discretion on the part of the defendant.[28]

Given that the plaintiff was properly admitted into the rental program as a sex offender, the use of his sex offender status, an event that preceded his entry into the rental program, his receipt of benefits, and the promulgation of § 17b-812-13 (9) of the regulations, to terminate his benefits constitutes a "new obligation" under § 55-3, and, therefore, a retroactive application of that regulation.[29] With no argument that such retroactive application of the regulation is statutorily authorized, we conclude that the trial court improperly dismissed the plaintiff's administrative appeal. [30]

The judgment is reversed and the case is remanded to the trial court with direction to sustain the plaintiff's appeal.

In this opinion ROGERS, C. J., and PALMER and ZARELLA, Js., concurred.

[1] The Commissioner of Housing acts on behalf of the Department of Housing. For the sake of simplicity, all references to the defendant hereinafter include both the commissioner and the department.

[2] Formerly codified as General Statutes § 17b-812, General Statutes (Supp. 2016) § 8-345 provides in relevant part: "(a) The Commissioner of Housing shall implement and administer a program of rental assistance for low-income families living in privately-owned rental housing. For the purposes of this section, a low-income family is one whose income does not exceed fifty per cent of the median family income for the area of the state in which such family lives, as determined by the commissioner.

"(b) Housing eligible for participation in the program shall comply with applicable state and local health, housing, building and safety codes.

"(c) In addition to an element in which rental assistance certificates are made available to qualified tenants, to be used in eligible housing which such tenants are able to locate, the program may include a housing support element in which rental assistance for tenants is linked to participation by the property owner in other municipal, state or federal housing repair, rehabilitation or financing programs. The commissioner shall use rental assistance under this section so as to encourage the preservation of existing housing and the revitalization of neighborhoods or the creation of additional rental housing.

"(d) The commissioner may designate a portion of the rental assistance available under the program for tenant-based and project-based supportive housing units. To the extent practicable rental assistance for supportive housing shall adhere to the requirements of the [section 8 program] . . .

relative to calculating the tenant's share of the rent to be paid.

"(e) The commissioner shall administer the program under this section to promote housing choice for certificate holders and encourage racial and economic integration. The commissioner shall establish maximum rent levels for each municipality in a manner that promotes the use of the program in all municipalities. Any certificate issued pursuant to this section may be used for housing in any municipality in the state. The commissioner shall inform certificate holders that a certificate may be used in any municipality and, to the extent practicable, the commissioner shall assist certificate holders in finding housing in the municipality of their choice.

"(f) Nothing in this section shall give any person a right to continued receipt of rental assistance at any time that the program is not funded.

"(g) The commissioner shall adopt regulations in accordance with the provisions of chapter 54 to carry out the purposes of this section. The regulations shall establish maximum income eligibility guidelines for such rental assistance and criteria for determining the amount of rental assistance which shall be provided to eligible families. . . ."

We note that § 8-345 has been amended by the legislature subsequent to the events underlying the present appeal. See, e.g., Public Acts 2015, No. 15-29, § 3. Those amendments, however, have no bearing on the merits of the present appeal. For the sake of convenience, references to § 8-345 are to the 2016 supplement of the statute.

[3] Section 17b-812-13 of the Regulations of Connecticut State Agencies provides: "The department or its agent may deny program assistance to an applicant or terminate assistance to a participant for any of the following reasons:

"(1) A household family member fails to comply with the provisions of section 17b-812-12 of the Regulations of Connecticut State Agencies;

"(2) a household family member fails to sign or submit required forms;

"(3) a family with a rental assistance certificate fails to locate an approved dwelling unit within one hundred eighty days and does not demonstrate good cause for extending the expiration date of the rental assistance certificate;

"(4) a household family member has been terminated from a department rental assistance program in the last three years;

"(5) a household family member refuses to enter into a repayment agreement for monies owed to the department or its agent as a result of a program violation;

"(6) a household family member currently owes rent or other monies to the department or its agent in connection with a rental subsidy program;

"(7) a household family member has engaged in or threatened abusive or violent behavior towards the department or its agent's personnel;

"(8) a family fails to report income that results in rental assistance overpayment in excess of two thousand five hundred dollars; or

"(9) a household family member is subject to a registration requirement under a state or federal sex offender registration program."

[4] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[5] The plaintiff was first required to register as a sex offender in 1997, after he pleaded guilty in New Jersey to aggravated criminal sexual contact and endangering the welfare of children in violation of N.J. Stat. Ann. §§ 2C:14-3 (a) and 2C:24-4 (a) (West 1997). See also General Statutes § 54-253 (reciprocal sex offender registration). At the time the plaintiff entered the rental assistance program, he also was subject to a separate registration obligation arising from an offense committed in Connecticut, namely, a June 1, 2000 conviction for public indecency with a minor victim in violation of General Statutes § 53a-186. We note that his obligation to register as a result of that offense expired on October 6, 2010.

[6] The administrative plan sets forth policies for the implementation of the rental program in accordance with the regulations. When the plaintiff was admitted into the rental program in February, 2009, the numerous grounds for termination or denial of assistance were not promulgated as a regulation, but rather were set forth as policies in the 2008 revision of the administrative plan. See Dept. of Social Services, Administrative Plan for the Rental Assistance Program (July 1, 2008) pp. 15-1 through 15-3. Prior to the promulgation of § 17b-812-13 (9) of the regulations, the Department of Social Services added sex offender registration as a ground for termination or denial in the 2011 revision of the administrative plan. See Dept. of Social Services, Administrative Plan for the Rental Assistance Program (July 1, 2011) pp. 15-1 through 15-2.

[7] After assuming responsibility for the rental program, the defendant issued the 2015 revision of the administrative plan. See Dept. of Housing, Administrative Plan for the Rental Assistance Program (July 1, 2015). That plan, consistent with § 17b-812-13 (9) of the regulations, retains sex offender registration as a ground for the termination or denial of rental program assistance. Id., pp. 15-1 through 15-2.

[8] The decision acknowledged that the defendant was "not required to terminate [rental program] assistance if one or more of the enumerated conditions set forth in . . . § 17b-812-13 [of the regulations] is met, but ha[d] the discretion to do so." The decision stated that, its reasoning was informed by a review of the plaintiff's file "as well as all other related materials submitted by [the plaintiff's] counsel" and had "considered the following factors: [1] that [the plaintiff] is legally blind, [2] has other medical issues, [3] is listed on the [s]tate's [s]ex [o]ffender [r]egistry, [4] the nature of his offenses that led to such listing, and [5] the length of time that has passed since his convictions."

[9] The trial court observed that "it would be absurd to contend that the plaintiff had any expectation in 1997 that his conviction for endangering the welfare of children would lead to a termination of [rental program] benefits in 2013 or that, in contesting that conviction, he placed any reliance on the notion that a conviction would lead to his ineligibility for those benefits."

[10] The trial court also rejected the plaintiff's claims that the defendant had improperly: (1) deprived him of a hearing before rendering the May 1, 2014 decision; (2) been influenced by the staff of John D'Amelia Associates; (3) received ex parte communications in violation of General Statutes § 4-181; (4) failed to exercise discretion to consider mitigating factors; and (5) applied the regulation in a manner that violated his substantive due process rights by impermissibly impairing his vested property right to receive rental program benefits.

[11] The trial court subsequently denied the plaintiff's motion for an appellate stay of the trial court's judgment pursuant to Practice Book § 61-12. Prior to the transfer of this appeal to this court; see footnote 4 of this opinion; the Appellate Court upheld the trial court's appellate stay decision when it granted the plaintiff's motion for review, but denied the relief requested.

[12] The plaintiff also claims that the trial court improperly concluded that the defendant did not: (1) violate his due process rights by rendering a final decision without affording him a hearing; and (2) receive prejudicial ex parte communications in violation of General Statutes § 4-181 and due process protections. Because of our conclusion with respect to the plaintiff's retroactivity claim, we need not reach these other issues.

[13] General Statutes § 55-3 provides: "No provision of the general statutes, not previously contained in the statutes of the state, which imposes any new obligation on any person or corporation, shall be construed to have a retrospective effect."

[14] With the permission of this court, numerous amici curiae have filed a joint brief in support of the plaintiff, amplifying his argument that, "[e]xperts increasingly recognize that piling additional collateral consequences onto a sex offender registration requirement simply serves to destabilize prior offenders without offering any concurrent benefits." The amici are: the First Church of Christ in Hartford; the City of New Haven Project Fresh Start Reentry Program; Columbus House, Inc.; Community Partners in Action, Inc.; Connecticut Association for the Treatment of Sexual Offenders, Inc.; Connecticut Coalition to End Homelessness, Inc.; the Connecticut Conference of the United Church of Christ; Connecticut Criminal Defense Lawyers Association; National Alliance on Mental Illness Connecticut; National Coalition for the Homeless; National Law Center on Homelessness and Poverty; New Haven Legal Assistance Association, Inc.; Quinnipiac University School of Law Civil Justice Clinic; Reentry Central; Reform Sex Offender Laws; and Tri-Cord, LLC.

Although the arguments of the amici are thoughtfully crafted, they raise public policy considerations that are the primary province of the two political branches, and do not directly inform the administrative law questions that we must resolve in this appeal. Indeed, as their brief indicates, whether sex offender registries and provisions such as § 17b-812-13 (9) of the regulations constitute good public policy is "the kind of issue that is squarely on the radar of the legislature and the various interested entities." *Commissioner of Public Safety* v. *Freedom of Information Commission*, 312 Conn. 513, 551 n.35, 93 A.3d 1142 (2014); see also *State* v. *Arthur H.*, 288 Conn. 582, 588 n.4, 953 A.2d 630 (2008) (social science studies demonstrating that

" '[t]he popular myth that sex offenders reoffend at significantly higher rates than the remaining criminal population . . . is demonstrably false' " may "be worthy of further consideration," but are "essentially policy arguments that more properly are raised before our state legislature in support of reconsideration and reformation of the statutory scheme governing sex offender registration").

[15] "In civil cases, however, unless considerations of good sense and justice dictate otherwise, it is presumed that procedural statutes will be applied retrospectively. . . . While there is no precise definition . . . it is generally agreed that a substantive law creates, defines and regulates rights while a procedural law prescribes the methods of enforcing such rights or obtaining redress. . . . Procedural statutes . . . therefore leave the preexisting scheme intact. . . . [A]lthough we have presumed that procedural or remedial statutes are intended to apply retroactively absent a clear expression of legislative intent to the contrary . . . a statute which, in form, provides but a change in remedy but actually brings about changes in substantive rights is not subject to retroactive application." (Citations omitted; internal quotation marks omitted.) *Investment Associates* v. *Summit Associates, Inc.*, 309 Conn. 840, 868, 74 A.3d 1192 (2013).

[16] We note that the defendant also does not challenge the plaintiff's contention that the legislature has not expressly conferred retroactive rulemaking power on the defendant with respect to the rental program. Instead, the defendant argues that the trial court properly declined to reach the issue because it correctly concluded that the application of § 17b-812-13 (9) of the regulations was prospective.

[17] We previously have found the principles of *Landgraf* and its progeny instructive in retroactivity cases. See, e.g., *State* v. *Skakel*, 276 Conn. 633, 684 n.46, 888 A.2d 985 (discussing *Landgraf* in determining nature of extension of criminal statute of limitations), cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006); *State* v. *Faraday*, 268 Conn. 174, 196–97, 842 A.2d 567 (2004) (relying on *Immigration & Naturalization Service* v. *St. Cyr*, supra, 533 U.S. 289, in determining whether probation statute was being applied retroactively); accord *Massa* v. *Nastri*, 125 Conn. 144, 148, 3 A.2d 839 (1939) ("A statute will not be given a retroactive construction by which it will impose liabilities not existing prior to its passage. Laws which create new obligations . . . because of past transactions, have been universally reprobated by civil and common law writers, and it is to be presumed that no statute is intended to have such effect unless the contrary clearly appears. . . . The rule that laws are not to be construed as applying to cases which arise before their passage is applicable when to disregard it would impose an unexpected liability that if known might have caused those concerned to avoid it." [Citations omitted; internal quotation marks omitted.]).

Nevertheless, we observe that the distinction between substantive and procedural effects that we have consistently examined as a frame of reference to determine the applicability of the presumption against retroactivity; see footnote 15 of this opinion; has been described as outmoded in light of the more flexible analysis set forth in *Landgraf*. See *Stone* v. *Hamilton*, 308 F.3d 751, 755 n.4 (7th Cir. 2002); cf. *Miano* v. *Thorne*, 218 Conn. 170, 175–76, 588 A.2d 189 (1991) ("a statute which, in form, provides but a change in remedy but actually brings about changes in substantive rights is not subject to retroactive application" [internal quotation marks omitted]). Because there is no claim that the regulation in this case is procedural, we need not explore the extent to which the dichotomy between substance and procedure retains persuasive value post-*Landgraf* as a matter of state law.

[18] Specifically, we note that in *Bhalerao*, the court held that the statute, which revoked the plaintiff's right to practice medicine, "does not impose 'new legal consequences' to 'completed events' such as [the] [p]laintiff's conviction or his practice of medicine in the years since that conviction. Rather, the statute looks prospectively at [the] [p]laintiff's right to continue practicing medicine in the future. See also [*Immigration & Naturalization Service*] v. *Lopez-Mendoza*, 468 U.S. 1032, 1038, 104 S. Ct. 3479, 82 L. Ed. 2d 778 (1984) (characterizing deportation as 'look[ing] prospectively to the respondent's right to remain in this country in the future')." *Bhalerao* v. *Illinois Dept. of Financial & Professional Regulations*, supra, 834 F. Supp. 2d 783. In so concluding, the court stated that the statute "creates present and future effects on present and future conduct, and has no effect on past conduct," relying, in particular, on an observation by the United States Court of Appeals for the Seventh Circuit that "[i]t would border on the absurd to argue that these aliens might have decided not to commit drug crimes, or might have resisted conviction more vigorously, had they known that if they

were not only imprisoned but also, when their prison term ended, ordered deported, they could not ask for a discretionary waiver of deportation." (Internal quotation marks omitted.) Id., 783–84, quoting *LaGuerre* v. *Reno*, 164 F.3d 1035, 1041 (7th Cir. 1998).

[19] Specifically, we first observe that, in *Immigration & Naturalization Service* v. *St. Cyr*, supra, 533 U.S. 324, the Supreme Court significantly narrowed its prior characterization of deportation as "look[ing] prospectively to the respondent's right to remain in this country in the future"; *Immigration & Naturalization Service* v. *Lopez-Mendoza*, 468 U.S. 1032, 1038, 104 S. Ct. 3479, 82 L. Ed. 2d 778 (1984); a phrase that was specifically relied upon in *Bhalerao* v. *Illinois Dept. of Financial & Professional Regulations*, supra, 834 F. Supp. 2d 783. The Supreme Court stated in *St. Cyr* that *Lopez-Mendoza* simply "reject[ed] the argument that deportation is punishment for past behavior and that deportation proceedings are therefore subject to the various protections that apply in the context of a criminal trial. . . . As our cases make clear, the presumption against retroactivity applies far beyond the confines of the criminal law. . . . And our mere statement that deportation is not punishment for past crimes does not mean that we cannot consider an alien's reasonable reliance on the continued availability of discretionary relief from deportation when deciding whether the elimination of such relief has a retroactive effect." (Citations omitted; internal quotation marks omitted.) *Immigration & Naturalization Service* v. *St. Cyr*, supra, 324.

Second, the superficial reliance analysis in *Bhalerao* is directly undermined by the Supreme Court's decision in *Vartelas*, which criticized as "doubly flawed" the suggestion of the United States Court of Appeals for the Second Circuit that " '[i]t would border on the absurd . . . to suggest that [the plaintiff] committed his counterfeiting crime in reliance on the immigration laws.' " *Vartelas* v. *Holder*, supra, 132 S. Ct. 1490. In *Vartelas*, the Supreme Court emphasized that reliance matters only insofar as it relates to *Landgraf*'s "essential inquiry," namely, " 'whether the new provision attaches new legal consequences to events completed before its enactment.' " Id., 1491. The Supreme Court emphasized that, "[w]hile the presumption against retroactive application of statutes does not require a showing of detrimental reliance . . . reasonable reliance has been noted among the 'familiar considerations' animating the presumption . . . . Although not a necessary predicate for invoking the antiretroactivity principle, the likelihood of reliance on prior law strengthens the case for reading a newly enacted law prospectively." (Citations omitted.) Id.

[20] " '[D]ouble dipping' " is the colloquial term for the "collection by one person of a pension and a salary, both paid by the state." *Gormley* v. *State Employees Retirement Commission*, supra, 216 Conn. 527.

[21] Section 17b-812-5 of the Regulations of Connecticut State Agencies provides in relevant part: "(c) When the department or its agent determines that a family is eligible for rental assistance, the department or its agent shall issue the family a rental assistance certificate. The department or its agent shall inform the family of the family's obligations under the program as well as the responsibilities of the owner of the dwelling unit, and shall provide the family with applicable forms and information that may assist the family in finding a suitable dwelling unit.

"(d) The rental assistance certificate shall be used within ninety days of issuance. The department or its agent may extend the expiration date of the certificate in one or more increments, such extensions not to exceed a total of ninety days. The certificate holder shall have a maximum of one hundred eighty days to locate a suitable dwelling unit unless the department or its agent finds good cause to extend the maximum period.

"(e) The ninety day time limit stops running on the day the department or its agent receives a request for tenancy approval. If for any reason the dwelling unit cannot be approved, then the certificate holder shall be notified and the time limit shall resume running on the date notice is mailed . . . ."

[22] Section 17b-812-9 of the Regulations of Connecticut State Agencies provides: "(a) The department or its agent shall conduct an annual reexamination of the income and family composition of families participating in the rental assistance program. The department or its agent shall adjust the amount of each family's assistance payment at the time of the annual reexamination to reflect changes in the family's adjusted gross income.

"(b) During the term of the eligible family's rental agreement, the eligible family shall report changes in income or any change in family composition to the department or its agent within thirty days."

[23] The defendant's reliance on the annual reexamination process as pre-

scribed by the administrative plan rings particularly hollow, given that the defendant supports it only with a single citation to the table of contents of the 2008 administrative plan. As the plaintiff accurately notes in his reply brief, nothing in the administrative plan is inconsistent with the absence in the statute or regulations of a stated limitation on a term of enrollment in the rental program generally. Indeed, consistent with the regulation it implements; see Regs., Conn. State Agencies § 17b-812-9; that portion of the administrative plan prescribes only the following annual activities to be "coordinated around the anniversary date of the [rental program] contract": (1) "[r]eexamination of income and family composition"; (2) housing quality inspections; (3) "[n]ew [l]ease [a]greement [a]ddendum signed by tenant and owner"; and (4) "[r]ent to owner adjustment (must be under [median area rent], must not exceed reasonable rent)." Dept. of Social Services, Administrative Plan for the Rental Assistance Program (July 1, 2011) p. 12-1; see id., pp. 12-1 through 12-8.

By way of further background, we note that the introduction to chapter 12 of the 2011 revision of the administrative plan provides: "The [housing authority] will [reexamine] the income and household composition of all families at least annually. Families will be provided accurate annual and interim rent adjustments. [Reexaminations] and [i]nterim examinations will be processed in a manner that ensures families are given reasonable notice of rent increases. All annual activities will be coordinated in accordance with [housing authority] policy. It is a requirement that families report all changes in household composition. This chapter defines the [housing authority's] policy for conducting annual [reexaminations] and coordinating annual activities. It also [e]xplains the interim reporting requirements for families, and the standards for timely reporting." Id., p. 12-1

[24] Once a family deemed eligible for the rental program locates a "dwelling unit for rent," it must submit a "request for tenancy approval" to the defendant, along with "a copy of the proposed rental agreement . . . ." Regs., Conn. State Agencies § 17b-812-8 (a). The defendant then determines whether: (1) the proposed contract rent accords with the applicable schedules; and (2) the dwelling unit satisfies the applicable quality standards. See id. Once the defendant approves the arrangement, it notifies the family and enters into a "rental assistance contract" with the property owner, under which the defendant pays for the designated portion of the family's rent. See id., § 17b-812-8 (c).

[25] Section 17b-812-12 of the Regulations of the Connecticut State Agencies provides in relevant part: "(b) A family shall:

"(1) Provide information that is true and complete and in compliance with the provisions of the rental assistance certificate;

"(2) provide all forms and documents necessary for use in a regularly scheduled reexamination or interim reexamination of family income and composition;

"(3) provide the social security numbers of all household members and sign and submit forms that will allow the department or its agent to obtain information to determine eligibility;

"(4) not later than thirty days after a request by the department or its agent, provide the department or its agent information to verify that the family is living in the dwelling unit or information related to family absence from the dwelling unit;

"(5) notify the department or its agent in writing before any planned absence of thirty days or more, or on or before the thirtieth consecutive day of any unplanned absence. If the entire family is absent from the unit for more than ninety consecutive days, the department shall consider the unit vacated and shall terminate rental assistance, unless the family has notified the department or its agent on or before the thirtieth day of any absence and can show good cause for the extended absence on or before the ninetieth day of any absence. If the family shows good cause, the department or its agent may permit the family to be absent for up to sixty additional days before considering the unit to be vacated;

"(6) notify the department or its agent in writing not later than thirty days before moving out of the dwelling unit or terminating the lease;

"(7) use the dwelling unit as the family's sole residence;

"(8) notify the department or its agent in writing of the birth, adoption or court-awarded custody of a child, not later than thirty days after such birth, adoption or court-awarded custody;

"(9) request written approval from the department or its agent before adding any other adult family member as an occupant of the dwelling unit;

"(10) notify the department or its agent in writing if any member no longer

lives in the dwelling unit, not later than thirty days after such member leaves;

"(11) allow the department or its agent to inspect the dwelling unit at reasonable times and after reasonable notice as part of regularly scheduled reexaminations, interim examinations and on other occasions deemed necessary by the department or its agent;

"(12) immediately notify and forward to the department or its agent a copy of any notice to quit received by the tenant; and

"(13) pay utility bills and supply appliances that the owner is not required to provide under the rental agreement.

"(c) The family, including each family member, shall not:

"(1) Own or have any interest in the dwelling unit other than in a cooperative, or as the owner of a mobile manufactured home leasing space in a mobile manufactured home park, as such terms are defined in section 21-64 of the Connecticut General Statutes;

"(2) commit any serious or repeated violation of the rental agreement;

"(3) commit fraud, bribery or any other corrupt or criminal act in connection with the rental assistance program;

"(4) participate in any illegal drug or violent criminal activity leading to the individual's conviction;

"(5) sublease the dwelling unit;

"(6) receive rental assistance while receiving another housing subsidy for the same dwelling unit or a different dwelling unit under any other state, federal or local housing assistance program; or

"(7) willfully damage the dwelling unit or premises or cause serious or repeated damage to the dwelling unit or premises through negligence, or permit any guest to willfully damage the dwelling unit or premises or cause serious or repeated damage to the dwelling unit or premises through negligence."

[26] To this end, the dissent expresses concern about the potentially expansive effect of this decision on those persons who were registered as sex offenders prior to 2012, and are seeking, but have not yet received, rental program benefits. The dissent's concerns are unfounded, because, as the remainder of § 17b-812-2 (b) of the regulations makes clear, the "non-entitlement" aspect of the rental program is based on its limited nature, wherein the granting official is not obligated to provide benefits to all eligible *applicants*. See, e.g., *Colson* v. *Sillman*, supra, 35 F.3d 108–109 (applicants for benefits for physically disabled children lacked property interest because provision of benefits was entirely within discretion of public health authorities); cf. *Kapps* v. *Wing*, 404 F.3d 105, 114–16 (2d Cir. 2005) (applicants for public utility assistance benefits have entitlement and property interest subject to due process protection because governing regulations did not afford local authorities discretion to decline to assist eligible applicants). Indeed, limiting a program to available funds does not defeat a claim of entitlement. See id., 118 (utility benefits recipients' "claim of entitlement—while funds remain available—is the same as it would be were the program not contingent on the availability of sufficient funds"). Insofar as neither the defendant nor the dissent points to any statute, regulation, or policy putting current recipients seeking renewal in the same place as a first time applicant; see, e.g., *Barry* v. *Little*, 669 A.2d 115, 122 (D.C. 1995), cert. denied, 519 U.S. 1108, 117 S. Ct. 942, 136 L. Ed. 2d 832 (1997); the "non-entitlement" pronouncement in § 17b-812-2 (a) of the regulations has no bearing on the vested right component of the retroactivity inquiry in the present case.

[27] In particular, the defendant relies on a provision in the 2011 revision of the administrative plan entitled "Housing Authority Discretion" that provides as follows:

"In deciding whether to deny or terminate assistance because of action or failure to act by members of the family, the [housing authority] has discretion to consider all of the circumstances in each case, including the seriousness of the case. The [housing authority] will use its discretion in reviewing, the extent of participation or culpability of individual family members, the length of time since the violation occurred. The [housing authority] may also review the family's recent history and record of compliance, and the effects of denial or termination of assistance on other family members who were not involved in the action or failure to act.

"The [housing authority] may impose, as a condition of continued assistance for other family members, a requirement that family members who participated in or were culpable for the action or failure will not reside in the unit. The [housing authority] may permit the other members of a family to continue in the program." Dept. of Social Services, Administrative Plan

for the Rental Assistance Program (July 1, 2011) p. 15-5.

[28] The defendant argues that this characterization of the rental program leads to an "absurd result," because it would entitle the plaintiff "to a steady stream of [rental program] payments without limitation simply because he was initially found eligible for the program," and that "if the income level requirements for [rental program] participation were to change from one year to the next, a participant would be entitled to stay on the program indefinitely simply because he qualified at one time." We disagree. First, there is no vested right to a particular level of benefit payment in perpetuity, insofar as the regulations specifically contemplate adjustment of benefits in connection with the annual reexamination of income and family composition. See Regs., Conn. State Agencies § 17b-812-9; see also footnote 22 of this opinion. Indeed, even if a family retains its certificate to participate in the rental program despite a significant increase in income, the corresponding reduction in the rent benefit provided would protect the public fisc and perhaps provide the budget room for the admittance of another family into the rental program. See Dept. of Social Services, Administrative Plan for the Rental Assistance Program (July 1, 2011) pp. 12-1 through 12-3; see also id., p. 8-1 (providing for overissuance of rental program certificates "to the extent necessary to meet leasing goals" and for response to overleasing by "adjust[ment of] future issuance of certificates in order not to exceed the budget limitations over the fiscal year"). As the plaintiff points out, neither the regulations nor the administrative plan call for annual reassessment of the participants' "continued eligibility" for the program itself on income limits grounds, "unless the family is moving under portability and changing their form of assistance." Id., p. 12-2.

[29] Comparing the text of § 17b-812-13 (9) of the regulations to the federal statutes and regulations governing the section 8 program; see 42 U.S.C. §§ 13663 (a) and 13664 (a) (2) (B); 24 C.F.R. §§ 982.552 (b) and 982.553 (a) (2) (i); the defendant argues that the text and legislative history of the state regulations supports an interpretation that allows for termination based on sex offender status. Compare *Miller* v. *McCormick*, supra, 605 F. Supp. 2d 310 (concluding that statute and federal regulations governing section 8 program, "as they are written . . . do not allow the [housing authority] to cull from the participant population lifetime registrants whom it could have denied admission"), with *Zimbelman* v. *Southern Nevada Regional Housing Authority*, 111 F. Supp. 3d 1148, 1154–55 (D. Nev. 2015) (concluding that policy instructing housing authorities "to terminate registered sex offenders if they are mistakenly let into the program" was consistent with regulation allowing termination "for good cause" and enabling statutes under which "registered sex offenders could never make it into the housing program because [42 U.S.C.] § 13663 prohibits their admission" and "Congress presumably would have no reason to include a termination provision to address existing sex offender registrants who were never supposed to be in the program in the first place"). We agree with the dissent that, in contrast to the federal provisions, that the state regulation allows termination on the ground of registered sex offender status appears to be beyond cavil based on its plain and unambiguous language. That, however, does *not* answer the question before us in this appeal, namely, whether such application of the regulation was impermissibly retroactive in this case, which concerns a rental program participant who properly was admitted to the program prior to the promulgation of § 17b-812-13 (9) of the regulations. See *Immigration & Naturalization Service* v. *St. Cyr*, supra, 533 U.S. 325 n.55 ("our recognition that Congress has the power to act retrospectively in the immigration context sheds no light on the question at issue at this stage of the *Landgraf* analysis: whether a particular statute in fact has such a retroactive effect").

[30] The defendant contends that our conclusion will "prevent the government from modifying its policy to serve other deserving constituencies with limited dollars." The dissent echoes this concern, raising concerns about whether "more benign" acts committed prior to the promulgation of § 17b-812-13 of the regulations might not be usable as cause for termination of benefits; the dissent also posits that our analysis will "potentially caus[e] some regulations to become frozen in time, thereby eroding the discretion and flexibility of administrative agencies to provide continued public benefits when faced with finite resources to do so." We emphasize that these concerns are wholly inconsistent with our narrow holding in this case. First, although there is a property interest in the receipt of a public benefit so long as it is available, without statutory terms restricting its authority to do so, the legislature remains free to change or eliminate benefit entitlements

by amending or repealing the applicable statutes, including those that set eligibility criteria. See, e.g., *Atkins* v. *Parker*, 472 U.S. 115, 128–29, 105 S. Ct. 2520, 86 L. Ed. 2d 81 (1985) (food stamps); *Story* v. *Green*, 978 F.2d 60, 62–63 (2d Cir. 1992) (statutory exemption from municipal peddling regulations). Indeed, the extent of the procedural due process required depends on whether the change is an across-the-board adjustment to the formula, which does not require particularized notice to each recipient; see *Atkins* v. *Parker*, supra, 130; or whether the change is dependent on individual facts and circumstances. See *Youakim* v. *McDonald*, 71 F.3d 1274, 1291–92 (7th Cir. 1995) (due process requires individualized hearings on licensure applications before termination of benefits to children in existing "approved" homes following legislature's decision to make licensure of homes mandatory), cert. denied, 518 U.S. 1028, 116 S. Ct. 2571, 135 L. Ed. 2d 1087 (1996). Thus, should the defendant determine that potentially retroactive changes to the rental program are beneficial to the program's utility or viability, subject to applicable constitutional protections; see, e.g., *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, supra, 317 Conn. 439–40; the defendant's discretion is not, in the words of the dissent, necessarily "crippl[ed]"; rather, the defendant remains free to ask the legislature for the requisite authority to promulgate retroactive regulations. See, e.g., *Bowen* v. *Georgetown University Hospital*, supra, 488 U.S. 208–209; *Durable Mfg. Co.* v. *United States Dept. of Labor*, supra, 578 F.3d 503.

---